

**FILED**

May 31 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

___

**Instructions:** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | | |
|---|---|---|
| **CASE NAME:** | | **CASE NUMBER:** |
| USA v.  HARLAN KELLY and VICTOR MAKRAS | | **CR** 21-0402 RS |

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes | No ✔ | |
| **Total Number of Defendants:** | 1 | 2-7 ✔ | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ | |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔ | OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✔ | |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ | |
| **Is this a RICO Act gang case?** | Yes | No ✔ | |

**Assigned AUSA (Lead Attorney):** AUSAs Ward/Harris

**Date Submitted:** 5/31/2022

**Comments:**

RESET FORM    SAVE PDF

# United States District Court

FOR THE

**NORTHERN DISTRICT OF CALIFORNIA**

VENUE:  SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

HARLAN KELLY, and
VICTOR MAKRAS,

DEFENDANT(S).

---

# INDICTMENT

18 U.S.C. § 371 – Conspiracy to Make False; Statements to a Bank
18 U.S.C. § 1014 – False Statements to a Bank
18 U.S.C. § 1349-- Conspiracy to Commit Bank Fraud
18 U.S.C. § 1344(1), (2) – Bank Fraud
18 U.S.C. § 1349 – Conspiracy to Commit; Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud
18 U.S.C. § 2 – Aiding and Abetting
28 U.S.C. § 2461(c) – Forfeiture Allegation

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this __31st___ day of

_May, 2022_____.

Stephen Ybarra

Clerk

Bail, $ _No Bail_____

Hon. Joseph C. Spero, U.S. Magistrate Judge

1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,            )  CASE NO.  CR 21-0402-RS
                                         )
12           Plaintiff,                  )  VIOLATIONS:
                                         )
13       v.                              )  18 U.S.C. § 371 – Conspiracy to Make False
                                         )  Statements to a Bank
14  HARLAN KELLY, and                    )  18 U.S.C. § 1014 – False Statements to a Bank
    VICTOR MAKRAS,                       )  18 U.S.C. § 1349-- Conspiracy to Commit Bank
15                                       )  Fraud
    Defendants.                          )  18 U.S.C. § 1344(1), (2) – Bank Fraud
16                                       )  18 U.S.C. § 1349 – Conspiracy to Commit
                                         )  Honest Services Wire Fraud
17                                       )  18 U.S.C. §§ 1343, 1346 – Honest Services Wire
                                         )  Fraud
18                                       )  18 U.S.C. § 2 – Aiding and Abetting
                                         )  28 U.S.C. § 2461(c) – Forfeiture Allegation
19                                       )
    _____ )  SAN FRANCISCO VENUE
20

21              S U P E R S E D I N G   I N D I C T M E N T

22  The Grand Jury charges:

23                      Introductory Allegations

24  At all times relevant to this Superseding Indictment:

25       1.      Defendant HARLAN KELLY (KELLY) was the General Manager of the San Francisco

26  Public Utilities Commission (PUC), a position he was appointed to in 2012 and held until November 30,

27  2020.  Prior to his appointment to head the public utilities agency, KELLY was the Assistant General

28  Manager of Infrastructure, responsible for implementing billions of dollars in capital improvements for

INDICTMENT

FILED

May 31 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

water, sewer, and power in the City and County of San Francisco, California.

2.     Defendant VICTOR MAKRAS was a real estate broker and principal of Makras Real Estate, a corporation which provides professional real estate service in the San Francisco Bay Area, including property management and residential sales.  MAKRAS had also been a PUC Commissioner, and served on the San Francisco Employees Retirement System board.

3.     Contractor #1 was a construction company executive and permit expediting consultant who ran or controlled multiple entities that did business with the City and County of San Francisco.

4.     NK was the San Francisco City Administrator, a position which is the highest non-elected position in the City and County of San Francisco, in charge of overseeing 25 city departments.  NK resigned her position as City Administrator, effective February 1, 2021.

5.     KELLY and NK owned and resided in a home (the "KELLY residence") in San Francisco, California.

6.     Quicken Loans (now known as Rocket Mortgage) is a financial institution as that term is defined at 18 U.S.C. § 20 and 31 U.S.C. § 5312(a)(2).

<u>The Conspiracy and Scheme to Make False Statements to Quicken Loans</u>

7.      Beginning at a date unknown to the Grand Jury, but no later than in or about November 2013, and continuing through a date unknown, but to at least in or about April 2015, defendants HARLAN KELLY and VICTOR MAKRAS engaged in a scheme, plan, and agreement to make false statements or reports to Quicken Loans, a mortgage lending and financial institution, by making false statements on mortgage loan application documents, for the purpose of influencing the action of Quicken Loans.  The objectives of the scheme were, among other objectives, (a) to falsely inflate the amount of KELLY's mortgage balance owed to Makras Investors in order to obtain additional funds from Quicken Loans, (b) to conceal existing debts from Quicken Loans, including (i) credit card debt; (ii) Construction costs KELLY owed to Contractor #1 for construction work performed during a remodel on the KELLY residence and (iii) a large personal loan MAKRAS made to KELLY and NK,

1    and, (c) to repay undisclosed outstanding debts from the loan proceeds in a manner designed to conceal

2    that KELLY and NK were using a portion of the loan proceeds to repay these debts.

3                                    Manner and Means

4           8.      In furtherance of the conspiracy and to affect the objects thereof, in the Northern District

5    of California and elsewhere, HARLAN KELLY and VICTOR MAKRAS and others known and

6    unknown to the grand jury used the following manner and means:

7

8           a.   Beginning sometime after July 17, 2012, KELLY received authorization from the City

9                and County of San Francisco, Department of Building Inspection, for an extensive

10               remodel of the Kelly residence.

11          b.   On or about September 10, 2012, KELLY and NK borrowed $715,000 through an

12               interest-only private loan facilitated by MAKRAS and executed through a "Straight

13               Note" in which KELLY borrowed the $715,000 from a consortium of Makras Investors.

14          c.   Under the terms of the Straight Note, KELLY and NK agreed to pay interest only on the

15               loan, with monthly payments of $4,766.66.  The loan was secured by the Kelly residence

16               and two other parcels of real property.

17          d.   Beginning no later than October 2013, Contractor #1 began performing construction

18               work for the remodel of the Kelly residence.

19          e.   On or about November 29, 2013, KELLY sought a personal loan from MAKRAS and

20               sent a text message to MAKRAS stating: "I believe 70 will give us a contingency until

21               February. But we will [make] any amount work."

22          f.   On or about November 30, 2013, in connection with KELLY's previous inquiry about a

23               personal loan, MAKRAS sent a text message to KELLY stating: "After thinking about it

24               A bit, I recommend that I pay your credit cards directly.  This will avoid a large check

25               going into your account, Then needing to explain it to the bank. Banks do not like seeing

26               anything unusual about the flow of cash in and out of checking and savings accounts.

27               This will make the loan process go easy."

28

g.  On December 1, 2013, KELLY responded to MAKRAS's November 30, 2013 text message stating: "I agree and just emailed you our credit card statements."

h.  On or about December 2, 2013, MAKRAS caused four checks to be issued from his Bank of America Victor G. Makras Inc account ending in 2817 and totaling $70,000 to pay off outstanding credit card balances owed by KELLY and NK as follows:

    i.  $37,441.05 to KELLY Bank of America credit card ending 8667,

    ii.  $22,000.00 to NK JP Morgan Chase credit card ending 5864,

    iii.  $8,685.69 to NK JP Morgan Chase credit card ending 2650,

    iv.  $1,873.26 to NK JP Morgan Chase credit card ending 2475.

i.  On or about April 25, 2014, KELLY sent a text message to MAKRAS stating: "Victor, I wanted to cash out 200K.  This amount is for [sic] pay for money received and money owed and pay off [NK] student loan.  If you can put in a note saying I owe you it all good!  We can move forward."

j.  On or about May 1, 2014, MAKRAS emailed KELLY and NK a "Straight Note Modification" which was backdated to December 2, 2013 and purported to amend the original September 10, 2012 Note to Makras Investors by providing for an "Additional advance up to $200,000" at the same 8% interest rate.

k.  On or about July 2, 2014, MAKRAS submitted a "Written Payoff Demand Statement" to Old Republic Title Company which falsely stated that the principal balance owed to Makras Investors and Makras Real Estate by KELLY and NK was $915,000.

l.  On or about September 5, 2014, a Uniform Residential Loan Application was submitted to Quicken Loans to refinance the mortgages on the KELLY residence, in which KELLY and NK falsely stated that:

    i.  The unpaid balance on a mortgage loan owed to the Victor Makras was $915,000;

    ii.  KELLY and NK were paying 4,766.66 in interest on the total $915,000 mortgage;

    iii.  The cash out paid out to KELLY and NK as the borrowers was $5,011.06.

m.  Further, in the Uniform Residential Loan Application submitted to Quicken on September 5, 2014, KELLY and NK falsely stated their total liabilities by omitting the

$89,807 construction debt owed to Contractor #1, and concealing a $70,000 personal loan MAKRAS had provided KELLY in November 2013.

n.  In connection with their loan application to Quicken Loans, KELLY and NK also submitted to Quicken Loans the "Straight Note Modification" that had been signed by KELLY and NK and backdated to December 2, 2013 and which falsely stated that the Straight Note mortgage loan was amended to allow an additional advance up to $200,000, at the same 8% interest rate, on the original loan made by Makras Investors.

o.  KELLY did not disclose to Quicken Loans that MAKRAS had paid $70,000 to pay KELLY and NK credit card debt.

p.  KELLY did not pay MAKRAS interest on the $70,000 that MAKRAS lent KELLY to pay down KELLY and NK's credit cards.

q.  On or about October 11, 2014, a final loan application signed by KELLY and NK was submitted to Quicken Loans in which they again falsely stated that the loan balance owed to Victor Makras was $915,000 and falsely stating their liabilities by omitting an $89,807 construction debt and other debts.

r.  On or about October 11, 2014, KELLY and HK signed and caused to be submitted to Quicken Loans a U.S. Department of Housing and Urban Development HUD-1 form falsely stating that the amount of "cash out" from the loan that would go directly to the borrower was $4,343.55.

s.  As of October 11, 2014, KELLY and NK had not paid Contractor #1 for extensive construction work Contractor #1 performed on the remodel of the Kelly residence and had not repaid MAKRAS's for the $70,000 personal loan.

t.  On or about October 20, 2014, Quicken Loans funded a $1,300,000 refinance mortgage loan on behalf of KELLY and NK.

u.  On or about October 27, 2014, Contractor #1 submitted an invoice to KELLY in the amount of $89,807.80 for construction work Contractor #1 performed on the Kelly residence beginning on or around October 2013 and continuing through July 2014.

v.  In or around November 2014, Makras Real Estate prepared a "Consolidated Detailed

Property Statement" stating a beginning balance of $138,425.11, which included $130,000, reflecting the approximate amount of the remaining proceeds left over from the Quicken Loans after the true amount of the $715,000 Makras Investors loan and the MAKRAS $70,000 personal loan to KELLY and NK had been paid off.

w.  MAKRAS retained the excess amount of approximately $130,000 from the KELLY Quicken Loans proceeds in his Bank of America "Makras Real Estate Trust account 2" ending in 0265.

x.  On or about November 11, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 to Contractor #1 in the amount of $89,807.80 for the unpaid amount KELLY owed Contractor #1 for the remodel construction work performed on the Kelly residence.

y.  On or about November 26, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 in the amount of $17,000 to Chase Card Services for unpaid credit card debt owed by NK to Chase Card Services.

z.  On or about November 26, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 for $10,994 to Sunrun Solar for work performed by Sunrun Solar on the Kelly residence.  This debt was not disclosed by KELLY on the Quicken Loan application.

aa.  On or about December 10, 2014, MAKRAS caused a check to be issued from his Bank of America Makras Real Estate Trust account 2 ending in 0265 in the amount of $13,298 to Henry Gertmenian for an outstanding receivable in connection with the remodel of the Kelly residence.

bb.  On or about April 8, 2015, KELLY sent a text message to MAKRAS stating: "Hey Victor, based on my memory and using round numbers, checks issued were 90K, 13K, 17K, and 10K = 130K of the 138K.  However, I have not yet issued the 10K check yet.  I would like to issue a 16K instead.  The remaining balance goes toward duckhorn cab."

COUNT ONE: (18 U.S.C. § 371 – Conspiracy to Make a False Statement to a Bank)

9.    Paragraphs 1 through 8 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

10.    Beginning at a date unknown, but no later than in or about November 2013 and continuing through a date unknown, but at least until April 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

and others known and unknown to the Grand Jury, did knowingly conspire to devise and intend to devise a scheme and artifice to knowingly and willfully make a false statement or report in a mortgage application submitted to Quicken Loans, a mortgage lending business, by; (i) falsely claiming  KELLY was indebted to Makras Investors in the amount of $915,000, and; (ii) failing to disclose a large construction debt KELLY owed to Contractor #1, and; (iii) failing to disclose a $70,000 personal loan from MAKRAS to KELLY and NK, the proceeds of which were used to pay off existing credit card debt incurred by KELLY and NK, and; (iv) on or about September 5, 2014 falsely attesting to the accuracy of the loan application KELLY submitted to Quicken loans, in violation of Title 18, United States Code, Sections 1014 and 2.

All in violation of Title 18, United States Code, Section 371, and Title 18, United States Code, Section 2.

COUNT TWO: (18 U.S.C. § 1014 – False Statements to a Bank), and 18 U.S.C. § 2 (Aiding and Abetting)

11.    The factual allegations of Paragraphs 1 through 8 are re-alleged and incorporated as if fully set forth here.

12.    Beginning at a date unknown, but no later than in or about November 2013, and continuing through a date unknown, but no earlier than on or about April 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

and others known and unknown to the Grand Jury, did knowingly and willfully make a false statement

INDICTMENT                          7

or report in a mortgage loan application KELLY submitted to Quicken Loans by; (i) falsely claiming KELLY and NK were indebted to Makras Investors in the amount of $915,000, and; (ii) failing to disclose a large construction debt KELLY owed to Contractor #1 when listing their total liabilities, and; (iii) failing to disclose a $70,000 personal loan from MAKRAS to KELLY and NK when listing their total liabilities, and; (iv) on or about November 5, 2014 and again on October 11, 2014, falsely attesting to the accuracy of all the statements in the loan application the KELLYS submitted to Quicken Loans.

All in violation of Title 18, United States Code, Sections 1014 and 2.

COUNT THREE: 18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud)

13.     Paragraphs 1 through 8 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

14.     Beginning at a date unknown, but no later than in or about November 2013 and continuing through a date unknown, but at least until April 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

and others known and unknown to the Grand Jury, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud Quicken Loans, a financial institution, as to a material matter and to obtain money and property under the control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts and omissions of material facts with a duty to disclose, in violation of Title 18, United States Code, Section 1344.

All in violation of Title 18, United States Code, Section 1349.

COUNT FOUR: (18 U.S.C. § 1344(1), (2) – Bank Fraud) & § 2 (Aiding and Abetting)

15.     The factual allegations of Paragraphs 1 through 8 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

16.     Beginning at a date unknown, but no later than in or about November 2013, and

continuing through a date unknown, but no earlier than on or about April 2015, in the Northern District of California and elsewhere, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

and other known and unknown to the Grand Jury, did knowingly, and with the intent to defraud, devise and execute, and attempt to execute, a material scheme and artifice to defraud a financial institution, and to obtain moneys, funds, credits, assets, and other property that were then under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises.

Execution of the Scheme

17.     On or about the date set forth in the count below, in the Northern District of California and elsewhere, for the purpose of executing the scheme and artifice referred to above, and attempting to do so, defendants conducted or caused to be conducted the following financial transaction, among others:

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| FOUR | 10/20/2014 | A $1,300,000 mortgage loan in the name of KELLY and NK from Quicken Loans. |

All in violation of Title 18, United States Code, Sections 1344(1), (2) & 2.

The Honest Services Scheme to Defraud

18.     Beginning on a date unknown, but no later than September 2014, and continuing until on or about September 2017, in the Northern District of California and elsewhere, defendant HARLAN KELLY, a public official, knowingly, and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud the public of its right to the honest services of public officials through bribery and kickbacks in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts. The objectives of the scheme to defraud were, among other objectives, (a) to provide Contractor #1 with a competitive advantage during the bidding process for contracts with

the City and County of San Francisco by giving Contractor #1 confidential internal PUC information and documents to enable Contractor #1's bids to be more competitive; (b) in exchange for personal financial benefits from Contractor #1 including, but not limited to, discounted construction work on the Kelly residence, subsidized international vacations for KELLY and his family, and lavish gifts.

Means and Methods

19.     In furtherance of the scheme, and to affect the objects thereof, in the Northern District of California and elsewhere, defendant KELLY and others known and unknown to the grand jury used the following manner and means in an effort to defraud the citizens of the City and County of San Francisco of their right to the honest services of public officials:

a. Beginning no later than October 2013 and continuing through on or about July 2014, Contractor #1 performed extensive construction work on the Kelly residence.  Contractor #1 did not collect payment for this construction work until on or about November 11, 2014 when MAKRAS caused a check to be issued from MAKRAS's Bank of America Makras Real Estate Trust Account 2 ending in 0265 to Contractor #1 in the amount of $89,807.80.

b. On or about September 16, 2014, the San Francisco Public Utilities Commission (SFPUC) issued RFP 79002 - Request for Proposals (RFP) for LED Luminaires With Wireless Network Control System.  A pre-proposal conference was set for September 30, 2014 with proposals due by October 27, 2014.  The due dates were subject to change and as set forth below did, in fact, change several times.

c. On or about September 17, 2014, KELLY used his personal cell phone and texted Contractor #1: "Yes we finally got it out.  Keep me posted on you [sic] your proposal. (any problems). Panel is the next step."  Contractor #1 replied: "Ok see you tomorrow."

d. During the first week of November 2014, KELLY and Contractor #1 attempted to meet in person.

e.  After KELLY and Contractor #1 missed a meeting they had planned for November 4, 2014, KELLY arranged by text message to meet at Contractor #1's office restaurant on November 5, 2014.

f.  On or about November 11, 2014, KELLY texted Contractor #1: "I need to give you a document."

g.  On or about November 13, 2014, Contractor #1 and KELLY arranged by text message to personally deliver confidential PUC documents to Contractor #1 by having Contractor #1 drive in front of the PUC office and call KELLY when Contractor #1 was "down stairs."

h.  On or about November 13, 2014, KELLY sent someone to the ground floor of the PUC office to deliver the confidential PUC internal documents to Contractor #1.

i.  On or about November 13, 2014, Contractor #1 confirmed receipt of the confidential internal PUC documents and texted KELLY "Pick up from front desk."  KELLY responded by text message, "Call me after u read the docs."

j.  On or after November 4, 2014, KELLY provided Contractor #1 with additional confidential internal PUC documents regarding the project. Among the materials Contractor #1 received from KELLY was a PUC memorandum titled "RFP 79002 Bid Review," dated November 4, 2014.

k.  The November 4, 2014 PUC memorandum that KELLY gave Contractor #1 purported to "analyze[] the reasons for the variance between actual pricing and anticipated pricing for RFP 79002 - LED Street Lights with a Wireless Control System."  Among other things, this PUC internal memorandum contained tables summarizing and ranking the cost proposals for the 31 bids received by the PUC for the September RFP, identifying the bidder by name, the type of LED fixture used in the bid, the type of control for the LED used in the bid, and the costs associated with each LED fixture and control for each bid.

l.  On or about November 13, 2014, KELLY used his personal cell phone and texted Contractor #1:

    i.  Al will triple check but we both believe the minimum quals are pass/fail.

ii.  The LBE [Local Business Entity] points apply at all stages of the evaluation that are subjective (as opposed to min quals which is objective) thus they apply to the raw score at the quality evaluation and cost evaluation stages.

iii.  There were 4 of 31 proposals that initially we thought did not pass min quals; however, now we believe we will salvage 2 of the 4 - maybe 3 proposals. Al can speak with Mary tomorrow and provide you more details.

m.  On or about November 21, 2014, the PUC formally issued its amended RFP titled LED Luminaires with Wireless Network Control System, RFP 79002-A.  The RFP set a pre-proposal conference for December 11, 2014 and a new due date for proposals of January 9, 2015.

n.  On or about January 5, 2015, KELLY notified Contractor #1 by text, using KELLY's personal cell phone, that the PUC planned to delay the deadline for submitting RFPs for the Smart LED light contract.  KELLY texted Contractor #1: "We are going to postpone the LED light dates."  Contractor #1 replied "Till when," to which KELLY responded: "Weeks." KELLY also provided Contractor #1 with a name and number of an individual in the East Bay who had attended the pre-proposal conference in December.

o.  On or about January 15, 2015, Contractor #1 and KELLY exchanged the following text messages about the Smart LED light project:

Contractor #1: Current LED RFP does not require any assembly in SF

KELLY:      We legally can't requirer [sic] that. However, you can place that in the special consideration. Also one of the competitor [sic] already assemble in SF

R u certified?

Contractor #1: not yet

KELLY:      Did u talk with [name of individual provided on January 5, 2015]

Contractor #1: waiting for control UL we wont get till Jan 31

1    KELLY:        UL? You told me you had everything?

2    Contractor #1: The control from France just received information from UL

3    KELLY:        You told me That you had everything? I don't know what to do? I don't

4                  know how to stop the process anymore

5    p.  On or about January 27, 2015, Contractor #1 sent a text message to KELLY's personal

6        cell phone stating: "tech team reply, what you request is possible, do u have time to go

7        over what we find."

8    q.  On or about January 27, 2015, Contractor #1 texted KELLY "are you intown [sic]?"

9        KELLY replied "Yes, let me get the specs."

10   r.  On or about January 30, 2015, Contractor #1 and KELLY had the following text message

11       exchange:

12       Contractor #1: Good morning do u have a few minutes to catch up

13       KELLY:        Ok can you send some [sic] one over to pick up specs

14       Contractor #1: yes what time

15                     who should we see

16   s.  Later the same day, the private text messages between KELLY and Contractor #1 about

17       the LED Smart light RFP continued:

18       Contractor #1: can we go to pick up package yet

19       KELLY:        Come now to my office

20       Contractor #1: what floor

21                     on our way ps let u know what floor

22                     Green Source Trading, LLC

23   t.  On or about January 30, 2015, after Contractor #1 had received the "package" from

24       KELLY, Contractor #1 texted KELLY and stated: "review info we have question ps let

25       me know when can i call you."

26   u.  On or after May 20, 2015, KELLY gave Contractor #1 a paper copy of an email dated

27       May 20, 2015, which was addressed to KELLY and was from the PUC project manager

28       who was in charge of the LED Smart Lights RFP.  The subject of the email was "LED

RFP Follow Up Information."

v. On or after May 20, 2015, KELLY also gave Contractor #1, a spreadsheet titled "Harlan Summary," which had been attached to the email referred to in paragraph 15 u.  The spreadsheet listed various costs and licensing fees for LED control software by different vendors and evaluated software and cellular data costs over a 15-year period. The top three ranked "controls systems" are also identified.

w. On or after July 7, 2015, KELLY provided Contractor #1 with another hard copy spreadsheet titled "Summary Score Sheet w/LBE Discount" and dated July 7, 2015.  This spreadsheet was accompanied by a sticky note, a copy of which KELLY also gave to Contractor #1, that stated, "Harlan, This is the final spreadsheet produced by [employee] for use by OCA [Office of Contract Administration]."  The spreadsheet also ranked bidders by their scores and highlights the top 10 bids, including LBE discounts. Contractor #1's company was ranked near the bottom.

x. On or after July 26, 2015, KELLY gave Contractor #1 additional confidential internal PUC information on the bidding process, including hard copy spreadsheets titled "RFP 79002-A Summary Score Sheet 1" for each panelist who was ranking the bids.

y. In or around September 2015, the PUC decided not to award the LED Smart lights contract to any bidder.  Instead, the PUC issued a new RFP for the project, in September of 2016, this time as "TC 79004 LED LUMINAIRES."

z. In or around March 2016, during the period between the aborted 2015 RFP and before bids were due for the September 2016 Smart LED Lights RFP, Contractor #1 helped arrange for a personal vacation to Hong Kong and China for KELLY and his family. Contractor #1 accompanied KELLY and KELLY's family for a portion of the KELLY family vacation.

aa. In or around March 2016, Contractor #1 paid for various personal expenses for KELLY, his wife, mother-in-law, and two children, during the KELLY family vacation including, but not limited to, meals costing hundreds of dollars, jewelry, and hotel charges.

i. On or about March 25, 2016, Contractor #1 used his American Express credit card ending in 51005 to purchase jewelry costing $418.95 from Chow Tai Fook Jewellery Co. Ltd. for the benefit of KELLY and NK.

ii. On or about March 26, 2016, Contractor #1 used his American Express credit card ending in 51005 to pay $615.41 for a meal for the KELLY family at the Intercontinental HK Harbourside Restaurant in Hong Kong.

iii. On or about March 30, 2016, Contractor #1 charged $2,011.40 on his American Express credit card ending in 51005 to the Mira Hotel in Hong Kong to pay for KELLY and NK's stay at the Mira hotel.

bb. On or after November 22, 2016, KELLY provided hard copy internal PUC documents to Contractor #1, which were specifically notated as "Confidential," including spreadsheets titled "TC 79004 LED LUMINAIRES BID SCREENING OVERVIEW," and "TC 79004 LED LUMINAIRES SECTION 90 RESPONSIVE BID REVIEW."

cc. On or before April 2017, Contractor #1 performed repair work on KELLY's residence. Contractor #1 invoiced KELLY $23,236 for the repairs, but only charged KELLY $11,547 for that work.

COUNT FIVE: 18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud)

20.     Paragraphs 1 through 6 and paragraph 17 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

21.     Beginning at a date unknown, but no later than in or about September 2014 and continuing through a date unknown, but at least until September 2017, in the Northern District of California and elsewhere, the defendant:

HARLAN KELLY

and others known and unknown to the Grand Jury, including Contractor #1, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud the public of its right to the honest services of public officials through bribery and kickbacks in breach of the official's fiduciary duty, by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, in violation of Title 18, United States Code, Section 1343 and 1346.

1       All in violation of Title 18, United States Code, Section 1349.

2   COUNTS SIX THROUGH NINE: (18 U.S.C. § 1343, 1346 – Honest Services Wire Fraud)

3       22.     The factual allegations of Paragraphs 1 through 6 and 17 of this Superseding Indictment

4   are re-alleged and incorporated as if fully set forth here.

5       23.     On or about the dates set forth below, in the Northern District of California and

6   elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud the public of

7   its right to the honest services of public officials and attempting to do so, defendant KELLY did

8   knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire

9   communication, certain writings, signs, signals, pictures, and sounds; specifically, American Express

10  credit card charges made in Hong Kong by Contractor #1, on an account established and addressed and

11  billed in San Francisco, in the Northern District of California and an email account located in the

12  Northern District of California which transmitted to and from interstate commerce:

| COUNT | DATE | Wire Transmission |
|-------|------|-------------------|
| SIX | 3/25/2016 | $418.95 (USD) Charge, Chow Tai Fook Jewellery Co. Ltd., Hong Kong, on Contractor #1's American Express card, number ending 51005 |
| SEVEN | 3/26/2016 | $615.41 (USD) Charge, Intercontinental HK Harbourside Restaurant, Hong Kong, on Contractor #1's American Express credit card, number ending 51005 |
| EIGHT | 3/30/2016 | $2,011.40 (USD) Charge, Mira Hong Kong, on Contractor #1's American Express credit card number ending 51005 |
| NINE | 8/11/2017 | Email from Jaidin Consulting to KELLY with water damage repair invoices totaling $23,326.69 |

All in violation of Title 18, United States Code, Sections 1343, 1346.

FORFEITURE ALLEGATION:   (18 U.S.C. § 981(a)(1)(C), 982(a)(2)(B) and 28 U.S.C. § 2461(c))

24.     All of the allegations contained in this Superseding Indictment are re-alleged and

incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code,

Section 982(a)(2)(B) and Title 28, United States Code, Section 2461(c).

25.     Upon conviction for any of the counts set forth in Counts One through Nine of this

Superseding Indictment, the defendants,

HARLAN KELLY, and
VICTOR MAKRAS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

982(a)(2)(B) and Title 28, United States Code, Section 2461(c), all property, real or personal,

constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of

those violations, including but not limited to a money judgment equal to the gross proceeds the

defendant obtained directly or indirectly as a result of those violations.  If any of the property described

above, as a result of any act or omission of the defendant:

        a. cannot be located upon exercise of due diligence;

        b. has been transferred or sold to, or deposited with, a third party;

        c. has been placed beyond the jurisdiction of the court;

        d. has been substantially diminished in value; or

        e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(A), 982(a)(1) and (a)(2)(B), and

924(d)(1); Title 28, United States Code, Section 2461(c); and Federal Rule of Criminal Procedure 32.2.


DATED: _____May 31_, 2022                     A TRUE BILL.


_____/s/_____
FOREPERSON


STEPHANIE M. HINDS
United States Attorney


*/s/ David J. Ward*
DAVID J. WARD
Assistant United States Attorney


INDICTMENT                              17

AO 257 (Rev. 6/78)

**FILED**

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U...

May 31 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

BY: ☐ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
☒ SUPERSEDING

Name of District Court, and/...

NORTHERN DISTR...

SAN FRANCISC...

### OFFENSE CHARGED

18 USC § 371 - Conspiracy to Make False Stmts. to Bank
18 U.S.C. 1014 - False Statements to Bank
18 U.S.C. § 1349– Conspiracy to Commit Bank Fraud
18 U.S.C. § 1344(1), (2) – Bank Fraud
18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud
18 U.S.C. § 2 _ Aiding and Abetting

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Count 1: 5 years imprisonment, $250,000 Fine. Count 2: 30 years imprisonment, Counts 3 & 4: 30 years imprisonment; $250,000 fine; 5 years supervised release and $100 special assessment. Counts 5 through 9 (each count) 20 years imprisonment; $250,000 fine; 3 years supervised release and $100 special assessment

### DEFENDANT - U.S

▶ **HARLAN KELLY**

DISTRICT COURT NUMBER

CR21-402RS

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} SHOW DOCKET NO.

} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   STEPHANIE M. HINDS

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   /s/ David Ward

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

_____

Has detainer been filed?   ☐ Yes   ☒ No

} If "Yes" give date filed _____

**DATE OF ARREST** _____

Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** _____

Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☒ NO PROCESS*   ☐ WARRANT   Bail Amount: _____

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____   Before Judge: _____

Comments:

AO 257 (Rev. 6/78)

**FILED**

May 31 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT
☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

18 USC § 371 - Conspiracy to Make False Stmts. to Bank
18 U.S.C. 1014 - False Statements to Bank
18 U.S.C. § 1349– Conspiracy to Commit Bank Fraud
18 U.S.C. § 1344(1), (2) – Bank Fraud
18 U.S.C. § 1349 – Conspiracy to Commit Honest Services Wire Fraud
18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud
18 U.S.C. § 2 _ Aiding and Abetting

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Count 1: 5 years imprisonment, $250,000 Fine. Count 2: 30 years imprisonment, Counts 3 & 4: 30 years imprisonment; $250,000 fine; 5 years supervised release and $100 special assessment. Counts 5 through 9 (each count) 20 years imprisonment; $250,000 fine; 3 years supervised release and $100 special assessment

### DEFENDANT - U.S

▶ VICTOR MAKRAS

DISTRICT COURT NUMBER

CR21-402RS

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI

☐ person is awaiting trial in another Federal or State Court, give name of court

_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY  ☐ DEFENSE

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} SHOW DOCKET NO.

} MAGISTRATE CASE NO.

Name and Office of Person
Furnishing Information on this form   STEPHANIE M. HINDS

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)   /s/ David Ward/ Robin Harris

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges  ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

_____

Has detainer ☐ Yes  } If "Yes" give date filed
been filed?  ☒ No

DATE OF ARREST   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED   Month/Day/Year
TO U.S. CUSTODY   ▶

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT   Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____  Before Judge: _____

Comments: