PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

MATTHEW M. YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

DAVID J. WARD (CABN 239504)
KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorneys

      450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
      Telephone: (415) 436-7200
      Facsimile: (415) 436-6934
      david.ward@usdoj.gov
      kristina.green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 22-0402 RS |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| HARLAN KELLY JR., | |
| Defendant. | Sentencing Date: March 18, 2024<br>Judge: Hon. Richard Seeborg |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.     Offense Conduct ........................................................................................................2

     A.    Kelly and Wong's Long-Running Bribery Scheme ............................................2

          1.    Wong's Construction Work on the Kelly's Personal Residence ..........................3

          2.    The First Smart  LED lights Contract ................................................................4

          3.    The 2016 Hong Kong Trip ..................................................................................5

          4.    Maria Little's Trial Testimony ...........................................................................5

          5.    The PUC's Holiday Lights Purchases from Wong's Company ...........................6

     B.    The Quicken Loan Bank Fraud Scheme ............................................................7

     C.    The Honest Services Fraud Scheme Uncovered and Charged ............................9

DISCUSSION ......................................................................................................................9

I.     The Defendant's Sentencing Guidelines ....................................................................9

     A.    The U.S.S.G. Calculations ................................................................................9

     B.    Defendant's Objections to the PSR ...................................................................10

          1.    Objection Number 1: Acceptance of Responsibility ..........................................10

          2.    Objection Number 2: Gratuities vs. Bribes ........................................................11

          3.    Objection Number 3: The Offense Did Not Involve Multiple Bribes ..................12

          4.    Objection Number 4: Expected Profit is not the Benefit for USSG Calculations ........................................................................................................13

          5.    Objection Number 5 - Decrease Under §2X1.1 (Conspiracies, Attempts, Solicitations) ......................................................................................15

II.    Sentencing Recommendation ....................................................................................15

     A.    Legal Standard ..................................................................................................15

     B.    The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors .............................................................................16

          1.    The nature and circumstances of the offense and the need for the punishment to reflect its seriousness, promote respect for the law, and provide just punishment ...................................................................................16

U.S. SENTENCING MEMORANDUM
22-CR-0402 RS

2.    The History and Characteristics of the Defendant ...................................17

3.    Need for the sentence to afford adequate deterrence to criminal conduct ...............................................................................................................18

4.    Need to avoid unwarranted sentence disparities among similarly situated defendants .........................................................................................19

CONCLUSION .........................................................................................................20

1

## **<u>TABLE OF AUTHORITIES</u>**

2

### **<u>Cases</u>**

3

*Federal Election Commission v. National Conservative Political Action Committee,*
    470 U.S. 485 (1985)...................................................................................... 17

4

5

*Nixon v. Shrink Missouri Government,*
    120 S. Ct. 897 .............................................................................................. 16

6

7

*United States v. Arshad,*
    239 F.3d 276 (2nd. Cir. 2001)........................................................................ 13

8

9

*United States v. Blagojevich,*
    794 F.3d 729 (7th Cir. 2015) ......................................................................... 14

10

*United States v. Brennan,*
    629 F. Supp. 283 (E.D.N.Y. 1986) ................................................................ 16

11

12

*United States v. Bryant,*
    655 F.3d 232 (3d. Cir. 2011)..................................................................... 11, 12

13

14

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) ......................................................................... 15

15

*United States v. Ellis,*
    951 F.2d 580 (4th Cir. 1991) ......................................................................... 14

16

17

United States v. Kimbrough,
    522 U.S. 85 (2007)......................................................................................... 15

18

19

*United States v. Ochoa-Gaytan,*
    215 F.3d 1335 (9th Cir. 2000) ....................................................................... 11

20

*United States v. Santos,*
    501 Fed. Appx. 630 (9th Cir. 2012)........................................................... 17, 18

21

22

*United States v. Sorenson,*
    233 F.Supp.3d 690 (S.D. Iowa, 2017) ........................................................... 20

23

24

*United States v. Spano,*
    411 F.Supp.2d 923 (N.D. Ill. 2006) .......................................................... 18, 19

25

*United States v. Spencer,*
    799 Fed.Appx. 120 (3d Cir. 2020) ................................................................. 14

26

27

28

**Statutes**

18 U.S.C. §3553(a) ................................................................................................ 15, 16

18 U.S.C. § 371 .......................................................................................................... 1

18 U.S.C. § 1014 ................................................................................................. passim

18 U.S.C. § 1343 ........................................................................................................ 1

18 U.S.C. § 1344 ..................................................................................................... 1, 9

18 U.S.C. § 1349 ........................................................................................................ 1

**Rules**

Fed. R. Crim. P. 32(i)(2) ......................................................................................... 10

Fed. R. Crim. P. 32(i)(3)(B) .................................................................................... 10

U.S.S.G. Ch. 2 ........................................................................................................... 9

U.S.S.G. §2B1.1(b)(1)(I) ........................................................................................ 10

U.S.S.G. §2C1.1(a)(2) .............................................................................................. 9

U.S.S.G. § 2C1.1(b) ................................................................................................ 13

U.S.S.G. § 2C1.1(b)(3) ...................................................................................... 10, 17

U.S.S.G. § 4C1.1(a) ................................................................................................ 10

U.S.S.G §2C1.1(b)(2) ........................................................................................ 10, 14

U.S.S.G. §2B1.1 ...................................................................................................... 15

U.S.S.G. §2C1.1 ................................................................................................. 14, 15

U.S. SENTENCING MEMORANDUM
22-CR-0402 RS

iv

# INTRODUCTION

Defendant Harlan Kelly Jr. comes before this Court for sentencing after being convicted by a jury of participating in a long-running corruption scheme, and separately, of conspiring to defraud his mortgage lender.  After a twelve-day trial, a jury found Kelly guilty of six charges: one count of conspiracy to commit honest services fraud (18 U.S.C. § 1349), one count of honest services wire fraud (18 U.S.C. §§ 1343, 1346), one count of conspiracy to commit bank fraud (18 U.S.C. § 371), one count of bank fraud (18 U.S.C. § 1344), one count of conspiracy to make false statements to a bank (18 U.S.C. § 371), and one count of making false statements to a bank (18 U.S.C. § 1014).

At the time of his crimes, Kelly was the general manager of the San Francisco Public Utilities Commission ("SFPUC"), one of the highest-ranking appointed officials in San Francisco government. He oversaw the third-largest public utility in the state of California, an agency that employed over 2,300 people, served more than 2.7 million California residents, and had an annual operating budget over $1 billion, funded by the taxpayers. As head of the SFPUC, Kelly had a duty to the citizens of San Francisco to act in an upright and honest manner; to be a steward of public funds and public duties.

But driven by his greed and his arrogance, Kelly instead engaged in a years-long bribery scheme with a corrupt business executive who was seeking to win millions of dollars in city business over which Kelly had control. As if that wasn't enough; at the same time Kelly conspired with a a powerful and politically influential property owner and real estate investor to deceive his bank into approving a $1.3 million mortgage refinance loan.

These crimes were a stunning betrayal of the public trust.  Kelly violated his oath of office.  He failed to honor his duty of honest services to the citizens of San Francisco. He engaged in acts that cut at the heart of open and honest governance.  Kelly's conduct erodes the public's trust in their elected and appointed officials. It breeds cynicism and distrust of government.  It corrodes democracy.

For these crimes, the government asks the Court to sentence Kelly to 78 months imprisonment, three years of supervised release, and impose a fine of $250,000.

1

## BACKGROUND

2

**I.      Offense Conduct**

3

**A.      Kelly and Wong's Long-Running Bribery Scheme**

4

Kelly's crimes sit at the center of a large-scale federal investigation into public corruption that

5    has exposed a deep vein of greed and self-dealing that infected San Francisco politics for years.[1]  It has

6    resulted in the criminal convictions of more than a dozen individuals and two companies.  It is one of the

7    worst public corruption scandals in San Francisco's history.[2]

8

As the center of this web of corruption was Walter Wong, a corrupt permit expeditor who owned

9    a group of businesses that sought contracts with the City of San Francisco.  To further his business

10   interests, Wong engaged in years of bribery targeted at San Francisco public officials.  At the top of his

11   list was Harlan Kelly. Wong sought to buy Kelly's influence, and Kelly was for sale.

12

As charged in the Indictment and proved at trial, over the course of six years Wong lavished a

13   stream of bribes on Kelly, from discounted construction work, to thousands of dollars of expenses paid

14   for a lavish vacation the Kelly family took in 2016 to Hong Kong, Macau, and China.  None of this was

15   charity.  Wong's bribery was intended to influence Kelly to use his public position to direct millions of

16   dollars in city contracts to Wong, including a multi-million PUC contract to provide the city with LED

17   Smart Lights for city streets throughout San Francisco. While Wong never won that contract, Kelly still

18   used his position to secretly provide Wong with troves of internal PUC documents that laid out the

19   agency's internal reviews of competitors bids for that contract, internal emails among PUC officials, and

20   other confidential internal communications and documents.  Kelly also used his position to direct his

21   subordinates to purchase over $57,000 in holiday lights from a company owned by Wong's son.

22

23              [1] *See United States v. Mohammed Nuru*, 21-CR-0490 WHO; *United States v. Walter Wong*, 20-
          CR-0257 WHO; *United States v. Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-
24        0204 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. William
          Gilmartin*, 20-C4-0353 WHO; United *States v. Alan Varela*, 21-CR-0192 WHO; *United States v.
25        Florence Kong*, 20-CR-0354 WHO; *United States v. Sandra Zuniga*, 21-CR-0096 WHO. *United States
          v. Recology Inc.* 21-CR-0356 WHO, *United States v. Paul Giusti*, 21-CR-0294 WHO; *United States v.
26        John Porter*, 22-CR-0270 WHO; *United States v. Zhang Li*, 23-CR-0220 WHO; *United States v. Z&L
          Properties*, 23-CR-0221 WHO; *United States v. Ken Wong*, 23-CR-0162 WHO.

27              [2] *See:* https://sfstandard.com/2023/12/25/biggest-san-francisco-political-scandals-sex-bribes-
28        murder/; https://www.sfchronicle.com/opinion/openforum/article/sf-city-hall-corruption-18272032.php

1

### 1.    Wong's Construction Work on the Kelly's Personal Residence

2      The corruption charged in this case began in 2013.  At the time, Kelly was deep into an

3  extravagant rebuilding of his San Francisco residence, an elaborate and expensive remodeling project to

4  tear down his old San Francisco residence and turn it into a lavish three-story home that would

5  eventually be valued at more than $2.3 million.

6      By the fall of 2013, despite two years and over $700,000 of construction work already

7  completed, the evidence at trial established that Kelly's remodeling project was facing a variety of cost

8  overruns and other delays.  So Kelly turned to Walter Wong, who was eager to help.  Wong directed his

9  construction crews to begin performing what would be over 10 months of extensive construction and

10 repair work on the Kelly's residence.  *PSR* ¶ 24.  Wong's crews performed a long list of projects for

11 Kelly, including building a deck, installing landscaping and lighting, and importing and then installing

12 an opulent $7,000 wine cellar in Kelly's basement.

13     Wong never entered into a construction contract with Kelly for the work.  Trial Transcript, Vol.

14 5. pp. 823-824.   Wong never provided Kelly with an estimate, or a scope of work.  *Id.*  Wong never

15 demanded a down payment.  *Id.*   In fact, Wong worked for over a year without receiving any payment.

16 But for Wong, that wasn't what was important.  *Id.*  As Wong testified, it was never about getting paid

17 for the construction work; it was about providing illicit benefits to Kelly in order to influence Kelly to

18 help Wong win the much more lucrative business from the PUC:

19         *Q:  Overall, did you bill the Kellys for all the work you did on their house?*

20         *Wong:  No.*

21         *Q:  And why did you give the Kellys a discount on the work that you did for their house?*

22         *Wong:  I don't intend to bill Kelly anyway because I intend to get larger contract from*

23         *PUC.*

24         *Q: How is your billing them not everything that you did for them, not all the work,*

25         *connected to getting contracts with the PUC?*

26         *Wong:  Because I bill them less, I hope to get the PUC contract.*

27 Trial Transcript, Vol. 5. *pg. 829.*

28

### 2.   The First Smart  LED lights Contract

The "PUC contract" was a multi-million public works project the PUC was putting out for bids for a contract to install thousands of LED lights and "smart" control systems in city streetlights throughout San Francisco.  *PSR* ¶ 28.  For Wong and his companies, winning the contract would have meant over $1.6 million in profit.  *PSR* ¶ 28. The Smart Lights PUC contract was a project spear-headed by Harlan Kelly, and Kelly was willing to help Walter Wong.

The Smart LED lights contract was first announced publicly by the PUC in September 2014, in a Request for Proposal (RFP) put up on the PUC's website.  *PSR* ¶ 27.  The RFP requested bids, first by January 2015, and later, after an extension of the deadline, by March 2015.

The evidence at trial demonstrated that throughout the bid process Kelly illegally, as well as in violation of PUC rules and city ethics requirements, provided Wong with internal PUC information about the project.  In one instance, Kelly secretly texted Wong an internal PUC analysis of the bidders that had been sent confidentially to Kelly by Ivy Fine, one of his top deputies.  As Fine testified at trial, that communication was internal and confidential.  The information had no business going to Wong*:*

*Q:  When you sent your text message to Mr. Kelly, did you intend that the information you sent him would be shared with anyone outside of the PUC?*

*Fine: No.*

*Q:  Did you intend that the information would be shared with anyone who was seeking to bid on one of these RFPs?*

*Fine:  No.*

*Q: Would it have been allowed under the PUC rules and regulations at the time to provide this type of information to one specific bidder?*

*Fine:. No.*

*Q: Why not?*

*Fine:  Information from commencement of a procurement process through award of a contract is confidential, is seen as confidential information to protect the integrity of the competitive bidding process.*

U.S. SENTENCING MEMORANDUM          4
22-CR-0402 RS

Trial Transcript, Vol. 3, pg. 453

As the bidding process continued, Kelly continued to provide internal information to Wong, in blatant violation of PUC rules and the law.  In March 2015, Wong's company submitted a $9,207,515 bid for the Smart LED lights contract.  *PSR* ¶ 28.  Wong's expected profit from winning that contract would have been $1,622,263.  *Id.*  In the fall of 2015, the PUC decided not to award the contract, but to modify the specifications and requirements and put out a revised RFP.  *PSR* ¶ 29.  That RFP would not come out until 2016.  Wong had more time to buy Kelly's influence.

### 3.    The 2016 Hong Kong Trip

In March 2016, between the two LED Smart Lights RFPs, the Kelly family traveled to Hong Kong and China for what would be an extravagant week-long family vacation. Wong joined the Kellys, and used the trip as an opportunity to continue to lavish bribes on Kelly.

Wong's bribes included free stays for the Kellys at the Ritz Carlton hotel in Guangzhou, China, and the St. Regis hotel in Macau.  PSR ¶ 30.  Both were five-star luxury hotels, and the evidence at trial proved that the Kellys paid nothing for their stay at either.  *Id.*  In addition, Wong paid for the Kellys to take a day-long personal trip through an animal park in Guangzhou, for a gondola ride to the top of Kong Kong island, and for meals, including a $615 seafood buffet dinner at the Intercontinental Hotel overlooking Hong Kong harbor.  *Id.*  Wong even paid a $124 hospital bill for Kelly's son.  *Id.*

At trial, Kelly presented no financial records contradicting any of these charges, nor did he dispute the authenticity or completeness of the government's financial records, which were admitted at trial without objection.  Instead, Kelly had his mother-in-law Maria Little testify in his defense.

### 4.    Maria Little's Trial Testimony

Little, who accompanied Wong and the Kellys to China and Hong Kong, testified that she took out cash prior to the trip (bank records admitted at trial proved that the total was $400), and in addition, she had an "earthquake fund" of $200 to $300 in cash she kept in her condo that she also brought with her.  Trial Transcript, Vol. 9, pp 1152-53.  Little did not dispute that she only had between $600 and $700 in cash during the trip, and spent nothing on her credit cards.  But from this $600 to $700 in cash, Little testified that she was able to cover all her expenses during a week in Hong Kong, two days in

1    Guangzhou, and a day in Macau, including stays at the St. Regis Hotel in Macau and the Ritz Carlton

2    hotel in Guangzhou. Trial Transcript, Vol. 9,  pg. 1524.

3           *Q: And so the 6 or $700 you had in your earthquake fund in cash --*

4           *Little: Yes.*

5           *Q: That covered everything else?*

6           *Little:   Well, I used it. It was -- yeah.*

7           *Q. A week in Hong Kong, the two days in Guangzhou, and the day in Macao (sic)?*

8           *Little: Yes.*

9     Trial Transcript, Vol. 9,  pg. 1524.

10          Little repeatedly denied eating meals paid for by Wong.  Little testified that she went with Kelly

11   and Naomi Kelly to the Shangri-La hotel for lunch, saying "it was just us." *Id.*  pg. 1529.  Yet credit

12   card records showed that Wong paid $167 for that meal, and even in Little's diary describing the meal,

13   she wrote that "Walter and Soo are wonderful interpreters" *Id.*   Little testified that despite a $615

14   charge for a seafood buffet dinner, a dinner that Little herself described in detail in her diary, including

15   seeing a fireworks show, that she and the Kelly children didn't stay for the dinner because one of the

16   Kelly children was ill.  *Id.*   The jury did not believe Little, finding Kelly guilty of Count Seven, the

17   honest services wire fraud count for the $615 seafood buffet dinner paid for by Wong.  *PSR* ¶ 8.

18                  **5.       The PUC's Holiday Lights Purchases from Wong's Company**

19          In the end, Wong's company was not able to win the second Smart LED lights contract.  But

20   Wong continued to provide benefits to Kelly, and in 2018 and 2019, Kelly returned the favor.  The

21   evidence at trial established that Kelly abused his position as head of the PUC to explicitly direct his

22   subordinates to buy holiday light fixtures in the shapes of bells and Christmas trees that were used to

23   adorn streetlights on Third Street and Market Street in San Francisco from Walter Wong's son's

24   company, Alternate Choice, at the exact time that Wong was helping to repair extensive water damage at

25   Kelly's residence.  *PSR* ¶ 32.  In total, Kelly ordered his subordinates to purchase $57,717 in holiday

26   lights from Wong's company.

27

28

1

### B.    The Quicken Loan Bank Fraud Scheme

2      In 2014, the debts and cost overruns on the remodeling of his house that led Kelly to accept

3   bribes from Wong also led Kelly to commit additional crimes.  Deeply in debt and facing significant

4   cost overruns, Kelly turned to Victor Makras, a wealthy real estate broker and an influential political

5   figure in San Francisco who had, among other roles, served as head of the San Francisco Retirement

6   Board, as well as on the Public Utilities Commission and the Police Commission.  *PSR* ¶ 11.

7      To originally finance their home construction, Makras had personally arranged to lend the Kellys

8   $715,00 through an interest-only private loan from a group of Makras' investors.  *PSR* ¶ 15.  By early

9   2014, that loan was coming due, but Kelly's construction project had not been completed.  *Id.*  Kelly,

10  weighed down with other personal debts, including tens of thousands of dollars in credit card debts, was

11  struggling to refinance so he could repay the Makras investors.  *PSR* ¶ 16.  So Kelly again turned to

12  Makras.  First, Makras personally loaned the Kellys $70,000 to pay off credit card debts, and concealed

13  the loan from potential lenders by paying the credit card bills directly.  *PSR* ¶ 16.  But Kelly was still

14  unable to secure a mortgage refinance loan on favorable terms.

15     So Kelly and Makras devised the fraudulent scheme for which they were both convicted at trial.

16  At Kelly's request, Makras wrote a false and fraudulent "Straight Note" which claimed that the Kelly's

17  had borrowed an additional $200,000 from Makras, thus making it appear that the Kellys' total home

18  mortgage was $915,000.  *PSR* ¶ 17.  This was a lie.  In fact, the mortgage was $715,000, but Kelly and

19  Makras wanted to squeeze out another $200,000 in cash from the lender without disclosing that they

20  needed this cash to pay down credit card and construction debt.  *PSR* ¶ 17.  So, armed with Makras'

21  fraudulent "Straight Note," which was backdated to appear to have been executed in December 2013,

22  Kelly submitted a loan application to Quicken Loans that falsely claimed that the Kellys had a $915,000

23  mortgage with Makras and his investors.  *Id.*  They did not tell Quicken that the Kellys owed Makras

24  $70,000 for paying of their credit cards, or that they had $89,000 in unpaid construction debt they

25  needed to repay, or that they wanted additional funds to pay down other credit card and construction

26  debt.  They fraudulently concealed all of this from Quicken Loans.  *PSR* ¶ 19.  For Quicken, these lies

27  were highly material, and would have prevented the Kellys from obtaining the refinance loan they got.

28

1   *PSR ¶ 23.* As Quicken's loan appraiser Christine LaPorte testified at trial, Quicken would not have

2   approved the Kelly's loan had they truthfully disclosed that they had over $89,000 in unpaid

3   construction debt. Trial Transcript, Vol. 7, pg. 1136.   As LaPorte explained, unpaid construction debt

4   could put collection of the loan at risk because it could result in liens on the property, which would

5   impair Quicken's ability to collect repayment. *Id.* Further, LaPorte testified that Quicken would not

6   have approved the Kelly's loan had Kelly and Makras truthfully disclosed that Makras had given the

7   Kelly's a $70,000 interest free loan to pay down their credit cards.

8       *Q:  If Quicken saw in an application a $70,000 personal interest-free loan, what*

9       *additional steps would Quicken take, if any?*

10      *LaPorte:  We would first try to document it, if it was able to be documented. I'm not sure*

11      *if there was any sort of loan agreement that would have been made. If we   can't*

12      *document it, then we  just couldn't be able to set up the loan to pay off a    personal loan.*

13  Trial Transcript, Vol. 7, pg. 1133.

14      Finally, LaPorte testified that the Kellys were required to truthfully disclose the amount of "cash

15  out" they sought to obtain from the loan.

16      *Q:  Would Quicken require that the borrower disclose if they are planning to use cash,*

17      *cash out to pay off a personal loan?*

18      *LaPorte: Yes.*

19      *Q:  If a borrower wanted to use cash out to pay a construction debt, would Quicken*

20      *require that to be disclosed?*

21      *LaPorte. Yes.*

22  Trial Transcript, Vol. 7, pg. 1138.

23      The evidence at trial established that both Makras and Kelly understood the importance of their

24  deceit.  In a text to Kelly offering to secretly pay the credit card debt personally, Makras explained the

25  need for the deception; to prevent the banks from seeing that Makras was providing Kelly with a

26  $70,000 interest-free loan, writing: "*banks don't like seeing anything unusual about the flow of cash in*

27  *or out of the checking and savings accounts. This will make the loan process go easy.*"  PSR ¶ 16.

28

U.S. SENTENCING MEMORANDUM              8
22-CR-0402 RS

Quicken's LaPorte testified that Kelly and Makras' statements were false and fraudulent, were deceptive, and were material to Quicken.  The jury agreed.  Kelly was convicted of all four charges related to the Quicken loan fraud scheme: bank fraud, false statements to a bank, and conspiring with Makras to commit bank fraud and submit false statements to a bank.  *PSR.* ¶ 4.

### B.    The Honest Services Fraud Scheme Uncovered and Charged

On the morning of January 28, 2020, Mohammed Nuru, who himself had engaged in years of corruption with Wong, was arrested by the Federal Bureau of Investigation.  *See United States v. Mohammed Nuru*, 21-CR-0490 WHO.  Nuru was charged with participating in a sprawling honest services fraud scheme with Wong and others, as well as with false statements for lying to the FBI.  *Id.*

The investigation into Nuru and Wong soon led to evidence of Kelly's corruption and then to his bank fraud scheme.  On October 19, 2021 a seven-count indictment was filed charging Kelly and Makras with bank fraud and conspiracy to commit bank fraud, and charging Kelly with conspiracy to commit honest service fraud and honest services wire fraud for his scheme and conspiracy with Wong.  *Dkt. 1.*  On May 31, 2022, the government filed a Superseding Indictment adding charges of false statements to a bank and conspiracy to make false statements to a bank charges.  *Dkt. 64.*

Makras successfully had his case severed from Kelly and the case went to trial in August 2022.  *PSR* ¶ 8.  On August 26, 2022, a jury found Makras guilty of of one count of bank fraud (18 U.S.C. § 1344) and one count of making false statements to a financial institution (18 U.S.C. § 1014) for his scheme with Kelly to defraud and make false statements to Quicken Loans.  *PSR* ¶ 8.

### DISCUSSION

### I.    The Defendant's Sentencing Guidelines

### A.    The U.S.S.G. Calculations

The government agrees with U.S. Probation's calculation of the Guidelines.  Specifically, the government and U.S. Probation agree that the Guidelines for defendant Kelly are as follows:

a.    Base Offense Level, U.S.S.G. §2C1.1(a)(2):                    14

b.    Specific offense characteristics under U.S.S.G. Ch. 2:

The offense involved more than one bribe; §2C1.1(b)(3)            +2

The value of benefits expected to be received for the bribes was
$1,821,493, between $1.5 million and $3.5 million. U.S.S.G §2C1.1(b)(2);
U.S.S.G. §2B1.1(b)(1)(I):                                                                      +16

The offense involved a public official in a high-level or sensitive
decision-making position. U.S.S.G. § 2C1.1(b)(3):                                          +4

    c.      Reduction for Zero-Point Offender U.S.S.G. § 4C1.1(a) & (b):                      -2

    d.      Adjusted Offense Level:                                                          34

The government's understanding, based on the criminal history information in the Presentence Report, is that Kelly is a Criminal History Category I. *PSR* ¶ 68. As a result, his Sentencing Guidelines range is 151 to 188 months. *PSR* ¶ (Sentencing Recommendation Chart).

## B.   Defendant's Objections to the PSR

The defendant has lodged five objections to the Presentence Report. The government addresses each below. The Court, in order to resolve disputes with a presentence report, "must . . . rule on that dispute, or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The sentencing Court's ruling must be explicit. *United States v. Houston*, 217. F.3 1204, 1208 (9th Cir. 2008). The Court may order an evidentiary hearing and permit the parties to introduce evidence on the objections. Fed. R. Crim. P. 32(i)(2).

## 1.   Objection Number 1: Acceptance of Responsibility

Defendant argues that despite denying the allegations in the indictment and taking the case to trial, he is nonetheless entitled to a two-point reduction for acceptance of responsibility. *PSR* (Addendum to the Presentence Report - Objection No. 1). Kelly claims that he chose to go to trial to dispute some of the factual allegations, and that the jury agreed, acquitting him of Count Eight and Count Nine. *Id.* Further, defendant Kelly claims that he "proceeded to trial in order to challenge the applicability of the statute in relation to Mr. Kelly's conduct, Bribery versus Gratuity," citing to U.S.S.G. § 3E1.1 comment. (n. 2).

In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for

1   example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt

2   (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his

3   conduct)." But that did not happen here.

4       Kelly did not go to trial to challenge the legal applicability of the honest services fraud statute, or

5   to argue that as a legal matter the payments from Wong were gratuities, not bribes. Defendant Kelly

6   went to trial to contest all of the government's allegations and evidence, and he was found guilty. And

7   the Guidelines are clear that a defendant who goes to trial and puts the government to its burden of proof

8   is not entitled to a two-point reduction for acceptance of responsibility. *See U.S.S.G. §3E1.1 Note 2*

9   ("[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of

10  proof at trial by denying the essential factual elections of guilt, is convicted, and only then admits guilt

11  and expresses remorse."); *United States v. Ochoa-Gaytan*, 215 F.3d 1335 (9th Cir. 2000) (internal

12  citations omitted) ("[b]y challenging the elements of the offense and putting the government to its

13  burden of proof at trial, Ochoa-Gaytan failed to 'clearly demonstrate acceptance of responsibility for his

14  offense, notwithstanding his initial confession and subsequent expression of remorse.").

15      Kelly is not entitled to any reduction in his Guidelines range for acceptance of responsibility.

16          **2.      Objection Number 2: Gratuities vs. Bribes**

17      Defendant Kelly next argues that he should be sentenced using the Guidelines section that covers

18  gratuities, not for the section that covers sentencing for bribes. *See PSR* (Objection No. 2). A gratuity is

19  a payment made because of something already done, while a bribe is made intending to influence

20  someone to do something. *See United States v. Bryant*, 655 F.3d 232, 244 (3d. Cir. 2011) (a payment

21  "for something a public official was already planning to do or had already done [] is a gratuity (or

22  "reward") and not a bribe, and thus not in the core of honest services.").

23      This case has never been about gratuities. From the clear and unambiguous language in the

24  Superseding Indictment, to the witness testimony at trial, to the specific jury instructions, all of the

25  allegations and charges were for a fraud and conspiracy in which Kelly was accused and tried for

26  accepting *bribes* intending to influence him, not for gratuities paid in return for something he had

27  already done.

28

U.S. SENTENCING MEMORANDUM                    11
22-CR-0402 RS

1   The Superseding Indictment repeatedly alleges "a scheme and artifice to defraud the public of its

2   right to the honest services of a public official through *bribes and kickbacks*." *Dkt 64*. The Superseding

3   Indictment makes no mention of gratuities. The jury instructions also repeatedly reference bribes and

4   make no mention of gratuities. *Dkt. 297* (Final Jury Instructions). Most relevant, Jury Instruction 25,

5   related to the honest services wire fraud counts (Counts Seven through Nine), reads as follows: "the

6   scheme or plan consisted of a *bribe* in exchange for the defendant's services." *Id*. The instruction

7   defines a bribe as follows:

8       [t]he defendant accepts a "bribe" when he agrees to accept or receive something
9       of value in return for being influenced in the performance of an official act. In
        order to find that the defendant accepted a bribe, you must find that the defendant
10      acted corruptly."

11   This distinction between bribes and gratuities was amply proven at trial. For example, Wong

12   began doing construction work on Kelly's house in October 2013, months before the Smart LED lights

13   contract was even put out to bid. *PSR* ¶ 24. Wong testified unequivocally that he did that construction

14   work hoping to influence Kelly to help him win the LED lights contract. *See* Trial Transcript, Vol. 5.

15   pp. 823-824. (*Q: And why did you give the Kellys a discount on the work that you did for their house? .*

16   *. . Wong: Because I bill them less, I hope to get the PUC contract.*). That is a bribe; a payment

17   intending to influence a *future* action, not a gratuity.

18   The expenses during the Hong Kong trip fall into the same category. They were made months

19   before the second LED Smart Lights contract RFP was put out for bid. Same with Wong's 2018 work

20   on Kelly's house, which was done in advance of Kelly pressuring his subordinates to buy holiday lights

21   from Wong's company. Given this, the proper U.S.S.G. instruction is §2C1.1, which covers bribes, and

22   Kelly's base offense level is 14 because at the time he was a public official.

23       **3.      Objection Number 3: The Offense Did Not Involve Multiple Bribes**

24   Defendant Kelly next claims that the scheme did not involve "*more than one bribe or extortion*,"

25   and therefore he is not subject to a two-point increase under §2C1.1(b)(1). PSR (Objection No. 3).

26   Kelly argues that the "gratuity(ies) was related and constituted a single course of conduct by Mr. Wong

27   and were directed toward achieving a single objective, an edge over others in the bidding process." *Id.*

28
U.S. SENTENCING MEMORANDUM            12
22-CR-0402 RS

But the evidence at trial showed clearly just the opposite; that Kelly accepted multiple bribes, over six years, for multiple purposes.  Wong paid Kelly bribes in discounted construction work on his house in 2013 and 2014 hoping Kelly would help Wong win the LED Smart Lights contract, to payments for a lavish Hong Kong and China trip for his family in 2016 in the hope that Kelly would help Wong win the second LED Smart Lights contract, to additional repair work on his residence in 2017 and 2018 that he hoped would influence Kelly to give additional PUC business to his companies.

The payments, all separate, were intended to influence Kelly to take multiple official acts or actions to benefit Wong: awarding him the originally LED lights contract in 2015, awarding him the re-issued LED lights contract in 2016, and later, directing the PUC to buy holiday lights from one of Walter Wong's companies.

The Guidelines are clear that are clear that in cases where there is more than one bribe, the Guidelines level is increased by two points.  *U.S.S.G. § 2C1.1(b)(1 )*("If the offense involved more than one bribe or extortion, increase by 2 levels").  *See United States v. Arshad*, 239 F.3d 276, 282 (2nd. Cir. 2001).  Defendant argues that all of the bribes were related and "constituted a single course of conduct by Mr. Wong."  *PSR* (Objection No. 3).  But bribes of different amounts, over staggered amounts of time, seeking different actions, do not qualify as a single set of "related payments" for a single purpose. *Arshad,* 239 at 283 ("the fact that the payments were made to elicit different actions always trumps the other two factors.").   Given this, the two-point increase for multiple bribes is warranted and appropriate.

### 4.    Objection Number 4: Expected Profit is not the Benefit for USSG Calculations

Defendant next objects to the inclusion of a 16-point increase in the U.S.S.G. calculation based on the expected benefit Wong hoped to receive in return for his bribes to Kelly.  Probation's calculation is a correct application of the Guidelines in this case.  The Guidelines are clear that, in calculating a defendant's Guidelines range under §2C1.1 for bribery and honest services fraud offenses, the U.S.S.G. range is to be increased by "*the value of the payment, **the benefit received or to be received in return for the payment**, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government, whichever is greatest.*" §2C1.1(b)(2).

The Commentary to §2C1.1 notes that the benefit received or to be received often refers to contracts a bidder is seeking, and is calculated as the "the net value of such benefit." *See* § 2C1.1. The Guidelines section explicitly includes a reference to profits from a contract a conspirator sought to win through bribery or kickbacks. *See U.S.S.G.* §2C1.1, Application Note 3, Example B ("a $150,000 contract on which $20,000 profit was made, was awarded in return for a bribe; the value of the benefit received is $20,000.").

It does not matter that Wong was not awarded either of the LED Smart Lights contracts because the crime is focused on what the conspirators intended.  The Court should look to the intended benefit, even if not all of it was realized.  *See United States v. Blagojevich* 794 F.3d 729, 743 (7th Cir. 2015).  In *Blagojevich*, the district court found that the benefit received was $1.5 million because that was what the defendant intended to gain, even though he did not receive a benefit of that amount.  *Id.* ("the district judge did not err in either respect. The $1.5 million figure did not come out of a hat; it was a number discussed in the recordings. That nothing came of these overtures does not affect the calculation of loss under §2C1.1(b)(2)").  Other courts have reached the same conclusion.  *See United States v. Spencer*, 799 Fed.Appx. 120, 122 (3d Cir. 2020) ("[w]hat matters for purposes of U.S.S.G. § 2C1.1(b)(2) is what the defendant intended to receive from criminal conduct, regardless of whether anything results from the bribe.");  *United States v. Ellis*, 951 F.2d 580, 585 (4th Cir. 1991) (affirming the district court's calculation of the benefit to be received as including the value of a promised payment even though the promisor "later reneged on th[e] commitment"); U.S.S.G. § 2C1.1 background (emphasizing that the "object" of the bribe is what determines its estimated value).

In preparation for sentencing, the government asked an executive from Wong's company, Frank Chu, to provide to the government documents that demonstrated the profits that Wong's companies, Green Source Trading and Alternate Choice, expected to reap if they won the LED lights contract.[3]  Chu was interviewed by the government on January 12, 2024, and the FBI-302 interview report, along with the supporting documents Chu used to determine Wong's expected profits, were provided to U.S.

---

[3] Chu testified for the government at trial but did not testify as to the expected profits Wong expected to receive from the LED Smart Lights contracts. . *See Trial Trans.* Vol. 6.

Probation and the defendant.  Based on Chu's review of Wong's record, Wong's company expected to earn a profit of $1,622,263 had they won the first LED Smart Lights contract put out for bid in 2015, and $199,230 had they won the second LED Smart Lights contract put out for bid in 2016.  *PSR* ¶ 33.

Thus, Wong bribed Kelly intending to profit in the amount of at least $1,821,493, and that is the correct figure to use in calculating the "benefit to be received" for U.S.S.G. purposes.

### 5.    Objection Number 5 - Decrease Under §2X1.1 (Conspiracies, Attempts, Solicitations)

Defendant Kelly next argues that he should receive a three-point reduction under §2X1.1, claiming it is the applicable Guidelines to use for Count Five, which charged Kelly with Conspiracy to Commit Honest Services Wire fraud.  But §2X1.1 is only used in attempt cases, or when no other Guidelines sections is applicable.  *See* §2X1.1(c) ("When an attempt, solicitation or conspiracy is expressly covered by another offense guideline section, apply that guideline section.").  Here, §2C1.1 and §2B1.1 explicitly apply to honest services wire fraud and conspiracy to commit honest services fraud cases, and §2B1.1 explicitly applies to bank fraud and conspiracy to commit bank fraud cases.  *See U.S.S.G.*  Appendix A (Statutory Index).  U.S.S.G. Appendix A "specifics the offense guideline section(s) in Chapter Two (Offense Conduct) applicable to the statute of conviction."

Moreover, defendant Kelly was not charged with, nor convicted of, an *attempted* honest services scheme.  He was charged and convicted for both conspiring to commit honest services fraud (Count Five), as well as a substantive honest services wire fraud charge (Count Eight).  As such, USSG §2C1.1 and §2B1.1 are the appropriate Guidelines; defendant Kelly is not entitled to any reduction for attempt or solicitation under §2X1.1.

## II.    Sentencing Recommendation

### A.    Legal Standard

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process, and are to be kept in mind throughout the process.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence

1  sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991.  In accomplishing that goal, the

2  Court should consider the factors set forth in 18 U.S.C. § 3553(a):

3      (1)  the nature and circumstances of the offense and the history and
             characteristics of the defendant;

4

5      (2)  the need for the sentence imposed to reflect the seriousness of the
             offense, to promote respect for the law, and to provide just
             punishment for the offense;

6

7      (3)  the need for the sentence imposed to afford adequate deterrence to
             criminal conduct, and;

8      (4)  the need to avoid unwarranted sentence disparities among
             defendants with similar records who have been found guilty of

9            similar conduct.

10

11  **B.    The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a)
           Sentencing Factors**

12      **1.    The nature and circumstances of the offense and the need for the punishment
                to reflect its seriousness, promote respect for the law, and provide just
                punishment**

13

14        Kelly's crimes cut at the heart of open, democratic governance.  Bribery corrodes our public

15  institutions.  By its nature, it destroys the foundation of an open, accountable government.  Honest

16  services fraud corruption schemes involving bribes to public officials place the greed and avarice of the

17  few above the duty owed to the public by its public officials and those who seek to draw from the public

18  purse.  Corrupt public officials and their enablers line their pockets at the expense of the taxpayers and

19  the citizens.  It is a fraud on the public, who rightly expect that their public officials will act in good

20  faith in the public interest.

21        As Courts have repeatedly noted, there is no question as to the societal and civic harm wrought

22  by public corruption schemes.  *See e.g, United States v. Brennan* 629 F. Supp. 283, 300 (E.D.N.Y. 1986)

23  ("Bribery is a betrayal of trust.  Trust, the expectation that one will do what one is relied on to do, is a

24  precious necessity of every social enterprise . . . no crime is more corrosive of our institutions.").

25        As Justice Clarence Thomas explained, bribery is the "perversion or destruction of integrity in

26  the discharge of public duties."  *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas,

27  dissent), quoting 3 Oxford English Dictionary 974 (1989).  Chief Justice William Rehnquist echoed the

28

same sentiment in *Federal Election Commission v. National Conservative Political Action Committee*:, writing: "corruption is the subversion of the political process.  Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.  The hallmark of corruption is the financial *quid pro quo*: dollars for political favors."  470 U.S. 485, 497 (1985).

Harlan Kelly's conduct is exactly the sort of misconduct that the Court condemned, and it warrants a significant sentence from this Court.  It is made worse because of his position.  Kelly's Guidelines calculation incorporates a four-point increase to reflect the fact that he was a high-level public official.  *U.S.S.G. § 2C1.1(b)(3)*.  This enhancement is warranted because it reflects the increased severity of the conduct when the bribery involves officials with the most power and influence.

Defendant Kelly squarely fits this bill.  He was one of the highest-ranking appointed public officials in the City of San Francisco, reporting to the Mayor and the City Manager.  He oversaw a sprawling municipal agency that employed over 2,300 people and served 2.7 million customers.  Kelly oversaw a multi-million annual budget.  Kelly was in a unique position to exercise, and did exercise, significant authority and influence over hundreds of millions of dollars of city funds; taxpayer money.

The Ninth Circuit and others have upheld this enhancement for defendants who are high-level public officials or for those who seek to bribe them, noting that the harm from bribery and corruption of these officials is a distinct and additional harm given those officials' position of unique influence and power.  *See United States v. Santos*, 501 Fed. Appx. 630, 634 (9th Cir. 2012) ("the distinct harm at which § 2C1.1(b)(3) is aimed is the corruption of *high-level* public officials."). (Italics added).

### 2.    The History and Characteristics of the Defendant

By all accounts, Harlan Kelly's story should be the embodiment of the American dream.  He was raised in a stable and supportive family, and excelled as a young man in athletics and academics.  *PSR* ¶ 62.  Kelly has been married for 18 years; he has two children.  *PSR* ¶ 65.  He has a Bachelor's Degree in Civil Engineering from the University of California at Berkeley, and he is a licensed civil engineer and certified project manager.  *PSR* ¶ 79.  Professionally, he has excelled, rising through the ranks of the Public Utilities Commission, being appointed in 2016 to lead the agency as its General

Manager. *PSR* ¶ 69.  He has received a host of awards and recognition throughout his career.  *Id.*

Yet despite all that he was given, Kelly turned to corruption and fraud.  He abused and betrayed the position of trust he was put in. As an educated high-ranking public official with decades of service in San Francisco, Kelly knew what he was doing was wrong.  He knew it was illegal.  Yet Kelly let his greed overtake any sense of right or wrong, of ethics or morality.  Kelly's arrogance led him to conclude that the rules and the laws did not apply to him.

Moreover, Kelly's crimes were not a one-off event. They were not aberrant behavior.  Kelly engaged in a six-year corruption scheme.  And even worse, during the same period he committed bank fraud  in order to deceive his mortgage lender.  Kelly's crimes clearly demonstrated his view that the rules did not apply to him.  It was of no import to him whether he deceived the public or a mortgage lender so long as he achieved his ends.  Kelly's history and characteristics, held up against the conduct for which he has been convicted, weigh in favor of a significant custodial sentence in this case.

### 3.    Need for the sentence to afford adequate deterrence to criminal conduct

A substantial sentence in this case would send a clear message to others who would seek to bribe public officials for their personal or professional benefit: that such conduct will result in significant punishment.  It also sends a message to the public that the courts and the government take this conduct seriously and simply will not accept this kind of criminal activity from their public officials and those who would seek to profit from bribing them. The District Court in *United States v. Spano* eloquently explained the deterrence role that courts must play in public corruption cases:

> "We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.
>
> The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.
>
> Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials."

*Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.    Need to avoid unwarranted sentence disparities among similarly situated defendants

Section 3553(a) identifies the need for the Court, in imposing sentence, to avoid sentencing disparities between similarly situated defendants.  While each case, and each defendant, must be judged independently, and while the government acknowledges that drawing comparisons in an attempt to avoid unwarranted sentencing disparities is challenging; nonetheless, the government respectfully believes that the Court can and should look to the recent public corruption cases in this district in determining an appropriate sentence for defendant Kelly.

Most similarly situated to Kelly is Mohammed Nuru.  On January 28, 2020, Nuru, the then head of the San Francisco Department of Public Works, was charged with participating in a sprawling public corruption scheme and conspiracy, with, among others, Walter Wong.  *See United States. V. Mohammed Nuru*, 21-CR-0490 WHO, Dkt. 130.  Nuru pled guilty, and on August 25, 2022, was sentenced to 84 months in prison, three years of supervised release, and fined $35,000.  *Id*.

Like Kelly, Nuru was the powerful head of a large San Francisco municipal agency.  Like Kelly, Nuru was charged and convicted of similar honest services fraud scheme. Both men fundamentally betrayed their duties to the citizens of the City of San Francisco to personally enrich themselves through bribes.  Driven by their personal greed, lack of moral compass, and belief that the rules did not apply to them, both Kelly and Nuru accepted bribes that included lavish travel, free or discounted construction work, meals, drinks, and other benefits.  Both even accepted bribes from Walter Wong, including separate trips to China with Wong, where he lavished both with hotel stays, meals, travel, and other benefits, all the while seeking that each use their official position to benefit Wong's companies.

It is accurate that Nuru's bribery scheme was longer and involved more individuals.  But Nuru also pled guilty and accepted responsibility for his crimes. Kelly, conversely, denied the charges and took his case to trial.  And Kelly was also convicted of a separate fraud scheme; conspiring and scheming to defraud Quicken Loans through false representations.  Given Nuru's 84 month sentence, a 78 month sentence for Kelly is appropriate and fair, and will avoid unwarranted sentencing disparities among similarly situated defendants.

1

**CONCLUSION**

2        Corruption is a stain on the body politic. It has severe societal consequences, not the least being

3  the growing distrust and cynicism infecting U.S. politics and governance. *See United States v. Sorenson*

4  233 F.Supp.3d 690, 697 (S.D. Iowa, 2017) , *citing* Pew Research Center, Beyond Distrust: How

5  Americans View Their Government 25 (2015) ("it should be of grave public concern that approximately

6  74% of Americans believe that, in general, 'elected officials put their own interests ahead of the

7  country's").  The courts, including this Court, can combat this by sending a clear and unequivocal

8  message that public corruption and the abuse of the public trust by high-ranking public officials cannot

9  and will not be tolerated.  As the Court in *Sorenson* explained in sentencing a defendant convicted of

10  public corruption offenses:

11        *As Chief Justice Roberts noted, this Court, in discharging its duty to sentence defendant,*
        *must act as the voice of the community. When it comes to political corruption the*
12        *community—historically and presently—requires that real, tangible, and severe*
        *consequences meet those who gain a position of public trust and then abuse that trust for*
13        *personal gain.*

14
        *Unless that traditional principle is honored, political corruption will slowly corrode the*
15        *foundations of our democracy until it collapses under its own weight.*

16  *Id at 699.*

17        For the foregoing reasons, the government respectfully asks the Court to sentence Kelly to 78

18  months' imprisonment to be followed by three years of supervised release, and a $250,000 fine.

19

20  Dated: March 11, 2024                              PATRICK D. ROBBINS
                                                     Attorney for the United States
21

22                                                   */s/ David J. Ward*
                                                     DAVID J. WARD
23                                                   Assistant United States Attorney

24

25

26

27

28