BRIAN H GETZ, ESQ. (CSBN: 85593)
LAW OFFICES OF BRIAN H GETZ
90 New Montgomery Street, Suite 1250
San Francisco, CA 94105
Telephone: (415) 912-5886
Facsimile:  (415) 358-4770
Email: brian@briangetzlaw.com

JONATHAN MATTHEW BAUM (CSBN: 303469)
STEPTOE LLP
One Market Street
Steuart Tower, Suite 1070
San Francisco, CA 94105
Telephone: (510)735-4558
Email: jbaum@steptoe.com

Attorneys for Defendant
HARLAN KELLY, JR.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERIA, | Case No.: 3:21-CR-00402-RS |
| Plaintiff, | **DEFENDANT HARLAN KELLY, JR.'S SENTENCING MEMORANDUM** |
| vs. | |
| HARLAN KELLY, JR., | Sentencing: March 18, 2024 |
| Defendant. | Time:         10:00 a.m. |
| | Dept.        Courtroom 3 – 17th Floor |
| | Judge:       Hon. Richard Seeborg |

# TABLE OF CONTENTS

I.    INTRODUCTION. ........................................................................................ 1

II.   BACKGROUND ......................................................................................... 2

III.  LEGAL STANDARD ................................................................................ 5

IV.   DISCUSSION .............................................................................................5

      A.  Value of the Benefit............................................................................ 6

          1. The Government's Calculation of "Expected Profits" is Not Reliable............7

          2. The Court Should Use the Value of the Bride to Calculate Mr. Kelly's
             Base Offense Level ...................................................................9

          3. The Value of the Bribe Received................................................14

      B.  Downward Variance Pursuant to 18 U.S.C. § 3553(a)........................15

V.    CONCLUSION. ........................................................................................ 18

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
TABLE OF CONTENTS
Case No.: 3:21-CR-00402-RS

# TABLE OF AUTHORITIES

**Federal Cases:**

*Kimbrough v. United States*,
    522 U.S. 85, 111 (2007)...................................................................................5

*Rita v. United States*,
    127 S. Ct. 2456, 2473, 168 L. Ed. 2d 203 (2007)...............................................16

*United States v. Ameline*,
    409 F.3d 1073, 1085 (9th Cir. 2005) ..............................................................5, 6

*United States v. Carty*,
    520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(A)) ..........................5

*United States v. Dare*,
    425 F.3d 634, 642 (9th Cir. 2005) ....................................................................5

*United States v. Frega*,
    179 F.3d 793, 812 (9th Cir. 1999). ..................................................................10

*United States v. Griffin*,
    324 F.3d 330, 366 (5th Cir. 2003) ....................................................................8

*United States v. McGowan*,
    668 F.3d 601, 607–608 (9th Cir. 2012) ......................................................7, 8, 9

*United States v. Nelson*,
    732 F.3d 504 (5th Cir. 2013) ..........................................................................12

*United States v. Ressam*,
    593 F.3d 1095, 1117–18 (9th Cir. 2010) ............................................................5

*United States v. Ring*,
    811 F. Supp. 2d 359, 376–77 (D.C. Cir. 2011)............................................12, 13

*United States v. Robles*,
    No. CR 04-1594 B SVW, 2015 WL 1383756 at *6 (C.D. Cal. Mar. 19, 2015) (citing
    USSG § 2C1.1(b)(2).)......................................................................................6

*United States v. Vanderwerfhorst*,
    576 F.3d 929, 935–36 (9th Cir. 2009) ...............................................................9

*United States v. Wunder*,
    No. 09-40052-01-RDR, 2010 WL 654754, at *2 (D. Kan. Feb. 23, 2010) .................13

ii

**Statutes:**

18 U.S.C. § 3553(a) ...............................................................................5, 15, 16, 17

18 U.S.C. § 3553(a)(2) .......................................................................................5

18 U.S.C. § 3553(a)(2)(D) .................................................................................16

18 U.S.C. § 3553(a)(6) .......................................................................................16

USSG § 2C1.1 ............................................................................................5, 11, 15

USSG § 2C1.1(b)(2) ......................................................................................6, 13

USSG § 6A1.3(a) ................................................................................................7

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
TABLE OF CONTENTS
Case No.: 3:21-CR-00402-RS

# I.    INTRODUCTION

After presiding over Mr. Kelly's trial last year, the Court is aware of the facts of this case and the nature of Mr. Kelly's conduct, which has already resulted in him losing his job, his public standing, and likely his pension from the City of San Francisco, which forms the vast majority of his planned retirement income. While the jury convicted Mr. Kelly of substantive counts involving conspiracy, bank fraud, and honest services fraud, several facts stand out that make clear this is an atypical case.

First, Mr. Kelly's conduct did not result in financial loss to either the bank or to the City of San Francisco.  Second, while Mr. Kelly gave confidential documents to Mr. Wong, the documents provided were of limited use, and Mr. Wong's company, Green Source Trading, never came close to winning any bids.  After receiving these documents, Green Source Trading bid on two separate Requests for Proposals.  The first bid placed nearly last for failure to meet the minimum qualifications, and the second bid also failed preliminary evaluations.  Third, while this case was charged as a conspiracy, there was no evidence at trial that Mr. Wong and Mr. Kelly ever discussed (let alone agreed) whether Mr. Kelly would help him win any specific contract, how much such a contract would be worth, or how much profit Mr. Wong would receive as a result of winning such a contract.  In contrast, the documents Mr. Kelly provided Mr. Wong were of limited use because they were provided to him *after* the bidding process closed. While giving internal documents to Mr. Wong was wrong and may have given Mr. Wong's company some small, hard-to-measure advantage, Mr. Kelly's actions did not affect the bidding. Additionally, the evidence at trial showed that Mr. Kelly never once interfered in the bidding evaluation process, nor did he ever tell anyone he would do so.

Rather than a quid pro quo agreement to alter the result of a specific contract or set of contracts, the object of the conspiracy here was never clearly stated. As such, the Presentence Report's reliance on the "expected profit" from Mr. Wong's submission on the LED contracts—which never came up at trial and about which Mr. Wong has never been cross examined—cannot

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

be the basis for a dramatic increase in Mr. Kelly's sentence. Instead, the Court should consider the established facts about Mr. Kelly's life and his conduct.

Mr. Kelly exercised exceptionally poor judgment. He shared confidential material with a friend under circumstances that undermined public faith in the City's bidding process. As a result, he destroyed his reputation and caused great embarrassment to himself, his family, and the City he spent two decades working for.

The Court should impose a sentence that promotes respect for the law and underscores the primacy of honest government. At the same time, the Court must consider Mr. Kelly's offense in the context of his otherwise unblemished career and demonstrated commitment to benefit his community. For the reasons set forth herein, the Court should calculate Mr. Kelly's offense level using the value of the bribes he received and depart downward from the ultimate guidelines range due to mitigating factors including Mr. Kelly's health and to avoid sentencing disparities between Mr. Kelly and various others who have been sentenced for significantly more serious conduct.

## II.    BACKGROUND

Harlan Kelly, Jr. was born in Fresno, California to Harlan Leroy Kelly, Sr. and Shirley Kelly. Shirley Kelly was a hair stylist, and Harlan Kelly, Sr. was a warehouse manager for PG&E. Neither parent had a college degree. Despite their modest incomes, Mr. Kelly's parents managed to raise eight children, one of whom had special needs. Before Harlan's first year in high school, his family moved from diverse West Fresno to a more rural part of the county that was predominantly White. Mr. Kelly was one of few African-Americans in his school.

Mr. Kelly was aware of racial discrimination from an early age. While he was in high school, Mr. Kelly's father was a plaintiff in a class action lawsuit against PG&E for failing to promote African-Americans. Mr. Kelly recalls seeing his father distressed to the point of developing an ulcer and spitting up blood as a result of the stress of his involvement in the case. Under these conditions, Mr. Kelly, Sr. encouraged his son to pursue higher education so he would have greater opportunities.

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

After graduating high school, Mr. Kelly attended Fresno City College, where his performance on a math placement test led a counsellor to recommend he pursue a career in engineering. Knowing little about the field, Mr. Kelly planned to study at Fresno State, but at the last minute, he took a chance and applied to the prestigious civil engineering program at U.C. Berkeley. When Mr. Kelly was accepted to Berkeley, his parents urged him to not go: the family could not afford tuition. But Mr. Kelly's siblings, none of whom had college degrees, urged him to do anything he could to get out of Fresno.

Mr. Kelly recalls that attending Berkeley was an inflection point in his life. Berkeley, unlike Fresno City College, graded on a curve, so students were very competitive. This environment, along with high living costs, pushed Mr. Kelly to take on a number of jobs. To earn money during summers and school breaks, Mr. Kelly became a math tutor, and later applied for a position as a Student Trainee with the City of San Francisco. As a Student Trainee, Harlan worked under the City's engineers. He quickly distinguished himself by being one of the first in his department to use computers to assist with engineering projects. After graduating from Berkeley in 1986, Harlan was hired as a junior engineer at the Department of Public Works.

When Mr. Kelly began working for the City, there were very few African American engineers. From 1986 to 2003, Mr. Kelly rose through the ranks at the Department of Public Works by successfully managing large city projects, including repairs to City Hall after the 1989 Loma Prieta Earthquake and the 1990 work on Kezar Stadium. He will always be proud of his work on these projects.

Mr. Kelly first received his first leadership role when he was named by Mayor Willie Brown as Deputy Director of the Department of Public Works and later as City Engineer. In 2003, Mr. Kelly was appointed as the Assistant General Manager of Infrastructure at the Public Utilities Commission. There, he was responsible for a workforce of 2,500 employees and oversaw $10 billion in capital programs for water, sewer and power. In this role, Mr. Kelly has emerged as an authority on water, sewer, and power policy and has spoken at conferences

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

nationwide. Mr. Kelly even provided expert testimony before the United States Senate on wastewater resource recovery. (PSR at 19, n. 8).

Mr. Kelly recognized early in his career that he was unusually lucky, and he set out to give back and help communities of color succeed. In 1995, Harlan founded Project Pull, which encourages minority students to pursue careers in STEM and engineering, and is still active to this day. Project Pull provides summer internships for youth with City mentors, and many of its participants go on to pursue careers in public service. To date, Project Pull has served over 5,000 young people.

At the PUC, Mr. Kelly founded the Contracting Assistance Center, which helps minorities and small businesses within San Francisco learn how to bid for City contracts. Mr. Kelly further produced and executed a Social Impact Partnership Program, wherein the PUC partnered with local residents to build participation in local communities' workforce development, education, arts, environmental justice and land use, neighborhood revitalization, and small business opportunities.

Mr. Kelly is also a devoted father to his two children, ages 17 and 14 (PSR at ¶¶ 65, 67). The burden of Mr. Kelly's conduct on his family cannot be overstated, and it will follow him for the rest of his life. Though his conduct, he has humiliated his family. Harlan is particularly concerned that his actions will have lifelong implications for his oldest son, Harlan Kelly, III, whose name will be forever linked to his father's criminal conduct.

Mr. Kelly's conduct and the resulting criminal case have also taken a toll on his health. On February 21, 2024, Mr. Kelly was playing basketball at the YMCA when he went into cardiac arrest. He was rushed to the hospital and into emergency surgery, where doctors at San Francisco General discovered he had a 95 percent blockage in his left exterior artery. The doctors catharized the artery to clear the blockage, and Mr. Kelly now has a stent in his heart. Mr. Kelly is now on daily medications to thin his blood and manage his cholesterol. He is also on a strict diet and exercise regimen to reduce the odds of a second heart attack.

### III. LEGAL STANDARD

A sentencing court must impose a sentence that takes account of the factors enumerated in 18 U.S.C. § 3553(a). In particular, a court must fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a)(2); *see Kimbrough v. United States*, 522 U.S. 85, 111 (2007). As the Supreme Court has explained, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)).

The government bears the burden of proving the facts necessary to establish the base offense level for Sentencing Guidelines purposes. *United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005). As a general rule, the Court uses a preponderance of the evidence standard when making factual findings. *United States v. Dare,* 425 F.3d 634, 642 (9th Cir. 2005). The Sentencing Guidelines are just one factor among many a court must consider at sentencing, *United States v. Ressam*, 593 F.3d 1095, 1117–18 (9th Cir. 2010), and the Court "may not presume that the Guidelines range is reasonable." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court must make an individualized assessment and fashion a sentence that reflects the particulars of the offense and the unique characteristics of the offender. *Ressam*, 593 F.3d at 1117–18.

### IV. DISCUSSION

The Presentence Report contains several errors that result in an incorrect guidelines calculation for Mr. Kelly.[1] First, the "value" used to determine Mr. Kelly's offense level should

---

[1] Mr. Kelly incorporates by reference the Objections previously raised to the Presentence Report. This memorandum focuses primarily on the "value" calculation used in conjunction with USSG § 2C1.1, as it drives the majority of the government's proposed Guidelines range.

be the value of the bribe, not Walter Wong's supposed "expected profits" from both RFPs 79002-A and 79004 added together. Second, Mr. Kelly asks that the Court vary downward from the ultimate Guidelines range due to mitigating factors such as Mr. Kelly's history, Mr. Kelly's current health, and to avoid unwarranted sentence disparities between Mr. Kelly and those who have been sentenced for similar conduct.

### A.     Value of the Benefit

Although the evidence at trial was that Mr. Kelly never had any specific intention to provide any fixed amount of money or any specific contracts to Mr. Wong, the government now asks the Court to increase Mr. Kelly's guidelines range by 16 levels based on an "expected profits" valuation provided post-trial by the government's cooperating witness. This "expected profits" valuation has not been sufficiently established to form the basis of Mr. Kelly's sentence, and even if it had, it would not be the proper measure to determine Mr. Kelly's offense level in this case, because there is not a sufficient connection between these "expected profits" and the bribes at issue in this case.

Since Mr. Kelly's offense involved receiving bribes, his Guidelines range is subject to enhancement based on the pecuniary loss associated with his crime. *United States v. Robles*, No. CR 04-1594 B SVW, 2015 WL 1383756 at *6 (C.D. Cal. Mar. 19, 2015) (citing USSG § 2C1.1(b)(2).) The loss is calculated by the greatest among the value of the bribe payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense. *Id*. The government bears the burden of proof as to the appropriate value of the loss. *United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005).

The PSR asserts that Mr. Kelly's Guidelines range should be based on the "benefit to be received" by Mr. Wong as a result of his bribes to Mr. Kelly, which the PSR calculates as Mr. Wong's "expected profits" from both RFP 79002-A and 79004. This value amounts to nearly $1.9 million dollars and adds 16 points to Mr. Kelly's offense level—nearly half of the government's proposed adjusted offense level. (PSR at ¶¶ 42–49.) The Court should reject use of this value in determining Mr. Kelly's base offense level because the government has not

established by a preponderance of the evidence that Mr. Wong's profit expectations are sufficiently reliable. Because the government cannot reliably establish the "benefit to be received" as a result of Mr. Kelly's conduct, the Court should use the value of the bribes paid to Mr. Kelly to determine his offense level. Evidence at trial demonstrated that the construction work on the Kelly residence was not actually "discounted," so the value of bribes paid to Mr. Kelly was actually less than $700.

To the extent that the Court is considering using the unreliable, post-trial information offered by the government's cooperating witness, Mr. Wong, Mr. Kelly requests that the Court permit witness testimony at an evidentiary hearing. Mr. Kelly would call witnesses, including City employees who oversaw the contracting process, to prove that any expected profit by Mr. Wong would have been completely unreasonable and without basis under the circumstances.

### 1. The Government's Calculation of "Expected Profits" Is Not Reliable

The information forming the basis for Mr. Kelly's sentence must have "sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). The government's value calculation falls far short of this standard, because the only basis for the calculation is an unsworn and untested assertion of Walter Wong's "expected profits" from both contracts 79002-A and 79004. The values of these "expected profits" are entirely speculative and not supported by reliable evidence nor trial testimony. As such, they cannot form the basis of Mr. Kelly's sentence.

Courts must reject facts that do not carry sufficient indicia of reliability when forming the basis of a defendant's sentence. In *United States v. McGowan*, the Ninth Circuit vacated a defendant's sentence because it had been influenced by unreliable and unverified facts. 668 F.3d 601, 607–608 (9th Cir. 2012). There, the district court sentenced a defendant convicted of assault to the high end of the Guidelines range based on post-trial accusations from a jailhouse informant that the defendant had used methamphetamine and smuggled drugs to inmates. The Ninth Circuit vacated and remanded the case for resentencing on the basis that (1) the allegations had not been subjected to many of the procedural mechanisms used to test witness testimony at

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

trial, (2) there was little reason to believe the accuser's claims, and (3) the allegations were completely uncorroborated. *Id.*

The "expected profits" calculation offered in the PSR suffers from the same infirmities as the facts rejected in *McGowan*. The calculations were not presented at trial and have thus not been tested. Further, the calculations hail exclusively from a convicted felon who has 'everything to gain and nothing to lose' by exaggerating Mr. Kelly's culpability, because Mr. Wong's own sentence for the fraud at issue may be reduced if he sufficiently "provide[s] substantial assistance" to law enforcement authorities in this case. *United States v. Wing Lok "Walter" Wong*, No. 20-00257 JD (N.D. Cal.) at Doc. 1, Walter Wong Plea Agreement at ¶ 18; *see also McGowan*, 668 F.3d at 608. Counsel's communications with the government confirm that the document containing the "expected profit" calculations was prepared by Mr. Wong's attorney and co-conspirator, Frank Chu, in November 2023—months after trial ended—and only for the purposes of Mr. Kelly's sentencing. (Getz Declaration, Exhibits 1 & 2.) It would be error to adopt these valuations for either RFP without any support in the record for their value. *United States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003) (holding that that the district court erred by adopting an expected profits calculation from a PSR that was not supported elsewhere in the record.)

Far from supporting Mr. Wong's profit calculations, evidence at trial casts serious doubt on the idea that Mr. Wong expected to receive the nearly $1.9 million in profits that he now claims. First, the government improperly adds the value of the 79002-A and the 79004 contracts together to reach this total, even though the evidence at trial was that the 79002-A contract was canceled and reissued as the 79004 contract. (Doc. 309, Testimony of Mary Tienken, Tr. Vol. 2 at 337:25–338.) In fact, the government argued at trial that Mr. Kelly's conduct in sharing information about bids on the 79002-A contract was improper *because* the 79004 RFP was really a continuation of the same project. (Doc. 309, Testimony of Mary Tienken, Tr. Vol. 2 at 315:4–14, "As long as [an RFP] was being rebid, [documents] would not be available until that item or

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

that service had been procured.")  The government cannot be permitted to base its case on one interpretation at trial, and then turn around to argue the opposite interpretation at sentencing.

Second, Mr. Wong's conduct at the time he received the documents from Mr. Kelly demonstrates that he did not expect to earn nearly $2 million as a result.  Washington Wong and Frank Chu stated that they reviewed the documents for only fifteen or twenty minutes to evaluate where Green Source's bid for RFP 79002-A may have "ended up".  (Doc. 311, Walter Wong Testimony, Tr. Vol. 4 at 700:13–701:7; Doc. 312, Testimony of Walter Wong, Tr. Vol. 5 at 770:19–25; Doc. 11, Testimony of Frank Chu, Tr. Vol. 4 at 656:3–4).  If Mr. Wong actually believed that the documents Mr. Kelly provided would help him earn nearly $1.6 million in profit, one would expect that he would look at the documents himself and attend the meeting where the documents were discussed, or at least ensure that the bid he was submitting with the benefit of this information met the technical specifications to even be considered by the City.  He did none of that. The only reasonable inference to be drawn from Mr. Wong's conduct is that he did not actually believe Mr. Kelly's assistance would result in Green Source imminently winning specific contracts that would net millions of dollars.

For these reasons, the "expected profit" calculation presented by the government is unreliable because it "lacks some minimal indicium of reliability beyond mere allegation," *United States v. McGowan*, 668 F.3d 601, 606 (9th Cir. 2012) (citing *United States v. Vanderwerfhorst*, 576 F.3d 929, 935–36 (9th Cir. 2009)) (internal quotations omitted).  It would be error—and a constitutional violation of Mr. Kelly's due process rights—for these calculations to make the basis for the Mr. Kelly's sentence. *McGowan*, 668 F.3d at 606.  The Court should therefore reject the "expected profits" calculations in determining Mr. Kelly's offense level.

        2.    The Court Should Use the Value of the Bribe to Calculate Mr. Kelly's Base Offense Level

Second, even if to the Court found Mr. Wong's expected profits to be reliable, the "expected profit" measure is not appropriate in this case because there was not a sufficient connection between that value and the bribes paid.

As an initial matter, RFP 79002-A was withdrawn and ultimately reissued as RFP 79004. It is impossible that Mr. Wong could have "expected," much less made, profits from an RFP that never resulted in a contract award to *any* bidding company for RFP 79002-A. On top of this, the government produced no evidence suggesting that Mr. Wong had or used any PUC documents in crafting his bid for the 79002-A project, so Mr. Wong's "expected profit" on that cancelled project cannot used to calculate Mr. Kelly's sentence. Washington Wong testified that Walter Wong did not provide the PUC documents until Green Source's bid for RFP 79002-A had been submitted, after which there was no opportunity to revise the bid using the information in the documents. (Testimony of Walter Wong, Tr. Vol. 5 at 769:12–24; 768:5–19, 769:2–6).

There was no possible scenario that Mr. Wong would have won the 79002-A, even if it was awarded; Green Source Trading failed to meet the minimum requirements to qualify and ultimately placed 47th out of 51 bids. Even if the Court accepts Mr. Wong's "expected profits" as the basis for Mr. Kelly's sentence, the $1,622,263 expected profit he attributed to the 79002-A contract must be removed.

To enhance Mr. Kelly's sentence based on the expected profits of either RFP 79002-A or 79004, the Court must have some "basis in the record for reasonably determining 'but for' benefit." *United States v. Frega*, 179 F.3d 793, 812 (9th Cir. 1999). *Frega* concerned an attorney who had bribed two judges. At sentencing, the government suggested that the "value" anticipated from the bribes was either the judgments won by the attorney's clients who were adjudicating their claims in the courts of the bribed judges or, in the alternative, the attorney's fees received by the defendant in the tainted cases. *Id.* The district court declined to use those values because the government had not connected any particular bribery payment to the judgments or the provision of attorney's fees, and the Ninth Circuit upheld that decision and its basis. *Id.* In other words, there was not sufficient evidence to conclude whether and to what extent the bribery had impacted the judgments, so the judgments themselves were not a proper measure for calculating the defendant's sentence. As such, the district court used the bribe payments themselves as the "value" contemplated in § 2C1.1. *Id.*

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

Here, the government cannot show a reasonable "but for" connection between the bribes and the value of Mr. Wong's expected profits—because such a connection does not exist. The bribery scheme at issue in this case centered on Mr. Kelly providing Mr. Wong with PUC documents to be used in connection with Mr. Wong's bids to win an LED contract with the City. Randy Parent, a Deputy City Attorney, testified at trial that Mr. Kelly could have "influence[d] bidding or who won a particular contract" if he wanted to, because Mr. Kelly was essentially the "CEO" of the PUC; he was responsible for "managing all of the PUC's hundreds of employees and managing the PUC's [] multi-billion-dollar budget" which included access to "all the information of the agency." (Doc. 317, Tr. Vol. 10 at 1584:23–1585:8.) But Mr. Kelly did not interfere with the evaluation of the bids. He was "not on" the panel evaluating the bids, nor did he "attempt to influence who was on [the] voting panel." (Doc. 309, Testimony of Kofo Domingo, Tr. Vol. 2 at 316:8–317:14.) Mr. Kelly did not vote on the bids. He did not pressure other PUC members or express his support of Mr. Wong's company, nor was there any evidence he told Mr. Wong he would.[2]

The uncontroverted testimony at trial was that Mr. Wong's companies were not remotely competitive. Trial testimony showed that both RFP 79002-A and RFP 79004 were evaluated in a five-step process, the first of which was a screening process in which a panel scored each bid on a number of qualifications. (Doc. 309, Testimony of Kofo Domingo, Tr. Vol. 2 at 258:23–260:8; 266:16–267:20.) If bids did not meet the minimum qualifications, they would not move on to the next evaluation phase. (*Id*. at 258:23–260:8.) Green Source's bid for 79002-A ranked 47 out of 51 bids and did not progress past phase one of the evaluations for that contract. (*Id*. at 274:20–277:12; *see also* Exhibit 668; Doc. 309, Tr. Vol. 2 at 285:21–286:6; Exhibit 662.) Green Source's bid for RFP 79004 also failed to qualify, this time at Phase III of the evaluations. (Doc. 309, Tr. Vol 2 at 295:1– 296:12; *see also* Exhibits 244 and 245; Tr. Vol. 2 at 300:5–25.) Kofo

---

[2] To the extent that the government now may argue that the PUC's purchase of Holiday Lights was part of the conspiracy between Mr. Kelly and Mr. Wong, the trial record is replete with evidence that this transaction was not affected by Mr. Kelly, and there is zero evidence in the record regarding any expected profit related to this transaction. (See Testimony of Richard Stevens, Tr. Vol. 7 at 1022.)

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

Domingo, a contract analyst at the PUC and later the assistant director of the City's Office of Contract Administration, testified that Mr. Wong's companies "did not pass the smell test for the bidding process." (Doc. 309, Testimony of Kofo Domingo, Tr. Vol. 2 at 307:22–308:3.)

Even if Green Source had somehow won RFP 79004 (or RFP 79002-A, had it not been withdrawn), any "expected profit" would have been purely speculative, because the company did not have the capability to complete the RFP's requirements. (Doc. 311, Testimony of Alaric Degrafinried, Tr. Vol. 4 at 598:3–599:8, confirming that Mr. Wong's company was disqualified from both RFPs because the company could not meet the minimum qualifications for the contracts; *see also* Doc. 309, Testimony of Kofo Domingo, Tr. Vol. 2 at 287:25–289:4, confirming that Mr. Wong's company would need to make "substantial modifications" to their proposed fixtures to qualify for RFP 79004. Where, as here, a company would have to complete additional steps to actually receive the benefits of a bribe, it is not proper to hold a bribed government official responsible for the bribe's expected benefit.

This principle is illustrated in *United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013), where the Fifth Circuit held that a public official's acts in support of a waste contractor in exchange for a bribe, including sending letters supporting the award of a multi-million dollar contract, were insufficient to conclude that the entire expected profit of the contract was attributable to the bribe because, even after gaining the public official's support through bribes, the contractor "necessarily would have to complete various further steps on its own initiative and merit before receiving millions in federal funds. *Id*. at 522. The reality in this case is that Mr. Wong would have had to undertake significant revisions to his proposals in order to meet the City's technical standards, which would have significantly increased his price and reduced any expected profit to closer to what the profit would have been on the other competitive bids. Given this reality, it is difficult to determine the value of any "benefit" Mr. Wong expected to receive. *See United States v. Ring*, 811 F. Supp. 2d 359, 376–77 (D.C. Cir. 2011) ("Determining even the gross value of these endeavors is a difficult exercise, to say nothing of the difficulty in determining what direct costs must be subtracted to determine the 'net value' of these benefits").

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

In situations like this, where the expected profit is unclear and there is not a direct "but-for" connection between the defendant's conduct and the expected profit, courts rely on a different measure: the value of the bribe. *See* USSG § 2C1.1(b)(2). This was illustrated in *United States v. Wunder*, No. 09-40052-01-RDR, 2010 WL 654754, at *2 (D. Kan. Feb. 23, 2010). In *Wunder*, a defendant city commissioner received bribes in connection with bids to construct a housing project. There—unlike here—the bribing party actually constructed the housing in question. However, the court still found that the value of the bribe was a better "value" calculation for sentencing than the profit the builder made from the housing project. This was because the ultimate decision to build the housing was "not affected by [the] illegal payments" according to evidence presented at trial. The court said: "If the decisions made by government officials were not affected by illegal payments, then the damage to the public and the government process is less and it makes more sense to the court to determine the 'loss' in such a case by the value of the payments." *Id.*

The *Wunder* court's reasoning is applicable here, where the bribes never resulted in a contract award because the company providing the bribes did not submit a competitive bid and could not meet the RFP's requirements. That Mr. Kelly was charged with conspiracy does not relieve the government of its burden to connect Mr. Kelly's actions to a realistic calculation of the benefits afforded Mr. Wong. It would be illogical to punish Mr. Kelly more severely for conspiracy than if he had actually interfered enough in the bidding process to swing the award to Mr. Wong. In that scenario, Mr. Wong would not have earned anything close to the profits estimated in the post-trial document that his counsel provided the government. *Ring*, *supra*, at 378. ("in determining the value of the benefits 'received or to be received in return for the payment,' the Court must take care to take into account benefits that would have been received in any event.")

Following this principle, courts have used the value of the bribe to calculate the guidelines range for several defendants guilty of bribery in similar cases. Alan Varela, William Gilmartin, III, and Nick Bovis, for example, were recently sentenced for providing bribes to

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

Mohammed Nuru, previously the Director of the Department of Public Works, in the form of free meals, entertainment, equipment, and the like. For all three of these defendants, the government used (and courts adopted) the value of the bribe that the defendants provided to Nuru as the basis for the Guidelines calculation—not the profit they expected to receive as a result of the bribe. *See United States v. Alan Varela and William Gilmartin III*, 21-CR-0192-WHO (N.D. Cal.), Doc. 49 at 4; *United States v. Nick Bovis*, 20-cr-00204-WHO (N.D. Cal.), at Doc. 89. For Bovis, the court calculated the Guidelines range using the bribe payments provided or the actual benefit that Bovis received from Nuru, despite the fact that Bovis admitted to bribing Nuru in the hopes of operating a restaurant inside San Francisco International Airport which, if it came to fruition, would generate "over $3 million in gross receipts over the 10-year life of the contract." *United States v. Nick Bovis*, 20-cr-00204-WHO (N.D. Cal.), Doc. 83 at 2–3. In other words, even where an "expected profit" was available, the value of the bribes given or benefits actually received by Bovis were more appropriate for calculating Bovis's Guidelines range. The Court here should similarly use the value of the bribes provided to Mr. Kelly to determine the applicable Guidelines range.

### 3. The Value of the Bribe Received

At trial, the government argued that Mr. Wong bribed Mr. Kelly by providing discounted work on Mr. Kelly's home and funding certain of Mr. Kelly's expenses during a trip to China in 2016. The jury rejected the government's claims as to hotel costs, as well as to costs related to repairing the water leak at the Kelly residence by acquitting Mr. Kelly on Counts Eight and Nine.

Trial testimony also supported the conclusion that the construction work done by Mr. Wong was not a "bribe" because the work was not discounted. Mr. Wong's primary bill of $89,000, for construction to Mr. Kelly's wine cellar as well as subcontractor work on items such as back yard turf and a garage door, included a 27 percent markup where only a 15 percent markup is standard in the Bay Area. (Doc. 317, Testimony of Anthony Froyd, Tr. Vol. 10 at 1607:16–21; *see also* Trial Exhibit 37.) Mr. Wong charged Mr. Kelly "excessive" labor rates for at least four of his laborers, (*Id*. at 1608:8–14), and charged Mr. Kelly improper markups for

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

work that was done by subcontractors by categorizing them as materials. (*Id*. at 1616, 1621.) The government argued that Mr. Wong's discounted the bill by failing to charge for labor in 2013, but testimony from Oscar Cauich explained that when Barry White Construction completed the Kelly residence renovation in 2013, 90–95 percent of the construction work was completed; All that was left to be done were small projects, including solar, waterproofing the deck, etc. (Doc. 316, Testimony of Oscar Cauich, Tr. Vol. 9 at 1497:22–1498:17.) The supposed 2013 labor omitted on the construction invoice appears to be labor completed by subcontractors, not Mr. Wong's team. *Id.* Further, no evidence was presented at trial regarding labor cards or Mr. Wong's construction workers testifying that they in fact completed work on the property in 2013. In fact, Frank Chu testified that the invoice was put together by accounting staff at the direction of Walter Wong, but he did not personally know if the work was actually completed because he never set foot on the property. (Doc. 311, Testimony of Frank Chu, Tr. Vol. 4 at 659:22–662:8.)

Others have also found Mr. Wong's invoices to be overpriced. For repairs related to water damage in the Kelly residence, Mr. Kelly's insurance company refused to pay more than half of the invoiced charge because Mr. Wong's invoice was significantly higher than industry standards and charged more labor hours than were necessary for the repair. (Doc. 317, Testimony of Paul O'Neill, Tr. Vol. 10 at 1571:15–18; *see also* Doc. 317, Testimony of Anthony Froyd, Tr. Vol. 10 at 1621:25–1624:10.) The government at trial offered no evidence to the contrary.

As found by the jury, the only bribe indisputably received by Mr. Kelly was the $615.41 charge that Mr. Wong made on his credit card for dinner at the Harborside Restaurant in Hong Kong (Testimony of Maria Little, Tr. at 1528:1–4.) The value of the bribes at issue in this case therefore only amounts to $615.41, a value too low to trigger an enhancement of Mr. Kelly's base offense level. *See* USSG § 2C1.1 (requiring base level offense enhancement only where the appropriate value calculation exceeds $6,500).

## B. Downward Variance Pursuant to 18 U.S.C. § 3553(a)

The Court should vary downward from Mr. Kelly's Guidelines range because of the unique circumstances of this case. Specifically, Mr. Kelly has a demonstrated history of serving

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

his community and recently suffered a heart attack. Further, a downward departure is necessary to "avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Section 3553(a) directs the court to consider "the history and characteristics of the defendant." This may include "family ties, or military, civic, charitable, or public service" that are not ordinarily considered in Guidelines calculations. *See Rita v. United States*, 127 S. Ct. 2456, 2473, 168 L. Ed. 2d 203 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, family ties, or civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.") Mr. Kelly's history is outlined in the "Background" section of this memorandum. As described therein, Mr. Kelly hails from humble roots as one of eight children raised by working-class parents in Fresno. Defying the odds, Mr. Kelly received an engineering degree from U.C. Berkeley and then dedicated his life to public service working for the City. Throughout his career, Mr. Kelly went out of his way to create programs that uplifted minorities, including Project Pull and efforts to make city contracts accessible to small and locally-owned businesses. Mr. Kelly's sentence should take his positive impact into account.

The Court should also consider Mr. Kelly's current health, as directed by Section 3553(a)(2)(D). In February of this year, Mr. Kelly—who is 62 years of age—suffered heart attack which required emergency surgery and the placement of a stent. Mr. Kelly's ability to access necessary medical care would be severely diminished during any custodial sentence imposed by the Court.

Finally, Section 3553(a)(6) instructs the Court to consider the sentences of other defendants who committed comparable conduct. Several San Francisco city officials have been charged with corruption in recent years, including former Director of the Department of Public Works, Mohammed Nuru. Nuru was previously the Deputy Director and then Director of the Department of Public Works in San Francisco. Unlike Mr. Kelly, Mr. Nuru actually did take

actions that resulted in contracts being improperly awarded, to a total of more than $100 million.[3] But Nuru himself received a sentence of only 84 months.[4] Those involved in Nuru's schemes have received even lower sentences.

Alan Varela, for example, was sentenced to 24 months of incarceration. (*See United States v. Alan Varela and William Gilmartin III*, 21-CR-0192-WHO (N.D. Cal.), Docs. 50, 79.) According to his plea agreement, Varela "provided free meals and entertainment for Nuru at various restaurants, cash, equipment for Nuru's ranch, and promised Nuru a portion of the proceeds that they expected to earn from City contracts or subcontracts awarded to them as a result of Nuru's official acts or influence." (*Id.*, Doc. 49 at 4.) Unlike Mr. Kelly, there is no evidence that Nuru was invoiced for or provided payment for these benefits. And as discussed above, the government used the "value of the payment" that Varela provided to Nuru to calculate the defendant's guidelines range. (*Id.*, Doc. 49 at 11.) Even Jack Abramoff, a lobbyist who bribed members of Congress to obtain favorable legislative action for his clients and who received *more than $23 million* in kickbacks, was sentenced to only forty-eight months. (*See United States v. Abramoff*, D.D.C. Case No. 1:06-cr-00001-ESH, at Docs. 42, 48.)

Mr. Kelly's ultimate sentence should be calculated with these cases in mind. Mr. Kelly should not receive a significantly higher sentence.

## V.    CONCLUSION

Following the mandate of section 3553(a) to impose a sentence that is "sufficient, but not greater than necessary," we ask the Court to craft a sentence that would reflect the seriousness of the offense while also considering Mr. Kelly's personal history and circumstances, including the

---

[3] Herrera's Public Integrity Investigation Saves SF Ratepayers $100M in Excessive Garbage Fees, https://www.sfcityattorney.org/2021/03/04/herreras-public-integrity-investigation-saves-sf-ratepayers-100m-in-excessive-garbage-fees/ (Mar. 4, 2021).

[4] *United States v. Mohammed Nuru*, 21-CR-00490-WHO at Doc. 125.

DEFENDANT HARLAN KELLY JR.'S SENTENCING MEMORANDUM
CASE NO.: 3:21-CR-00402-RS

needs of his family and children and his recent medical complications, as well as the sentences imposed on others similarly situated.

DATED: March 11, 2023                    Respectfully submitted,

                                         LAW OFFICES OF BRIAN H GETZ


                                         By:   */s/ Brian H Getz*
                                                 BRIAN H GETZ
                                                 JONATHAN BAUM
                                                 Attorneys for Defendant
                                                 HARLAN KELLY, JR.